989 P.2d 1120 (1999)
139 Wash.2d 694
In re the MARRIAGE OF Gary PAPE, Respondent, and
Margaret Johnson-Pape, Petitioner.
No. 67527-9.
Supreme Court of Washington, En Banc.
Argued June 10, 1999.
Decided December 23, 1999.
As Corrected February 15, 2000.
*1121 James Aldon Cathcart, Tacoma, for Petitioner.
John Stratford Mills, Tacoma, for Respondent.
GUY, C.J.
This is an appeal from orders entered in an action to modify the residential provisions of the parties' parenting plan. The basis of the motion to modify was the mother's proposed move, with the children, outside the area where the father resides. We are asked to clarify the standard to be applied in such an action and, specifically, are asked to decide: (1) whether the "minor" modification statute, RCW 26.09.260(5), applies to a move that disrupts the frequency of contact between a child and the left-behind parent; (2) whether this court's decision in In re Marriage of Littlefield, 133 Wash.2d 39, 940 P.2d 1362 (1997) applies to an action to modify a parenting plan; (3) what proof is required of the parties where the motion to modify is based on a proposed relocation by the primary residential parent; and (4) who has the burden of proof in such an action.
We hold that, pursuant to RCW 26.09.260(5), a parent may seek a "minor" modification in the residential schedule of a parenting plan in order to facilitate a geographic relocation of the parent's residence, if the child's primary residential parent is not changed by the modification. The moving parent must demonstrate a bona fide reason for the relocation. If the other parent resists the move, that parent must have an *1122 opportunity to show (1) no bona fide reason exists for the move or (2) the move away will be detrimental to the child and the harm suffered will be beyond the normal distress a child suffers due to travel, infrequent contact with a parent, or other hardships which predictably result from a move following dissolution.

FACTS
The parties, Gary Pape and Margaret (Peggy) Johnson-Pape, were married in June 1983. They separated nine years later, in 1992. By that time they had two children, a daughter, Whitney, born July 31, 1986, and a son, Cameron, born May 18, 1990. Clerk's Papers (CP) at 2. The parents were able to agree on a permanent parenting plan for the children, but were unable to resolve the financial issues involved in the dissolution of their marriage. The case was tried only on property division and maintenance issues. CP at 1.
During the school year preceding the dissolution trial, in June 1994, the mother had been employed in a temporary teaching position in Kitsap County. CP at 18. That job ended at the end of the 1993-94 school year. CP at 18. With respect to the mother's employment, the trial court found:
Wife had a full-time teaching job at the time of marriage. After marriage, she moved school districts to follow her husband to a better job on two occasions. After the birth of the parties' first child, she went to a half-time teaching position so that she could spend more time with the parties' first child. After the second child of the parties' was born, Mrs. Pape again moved to a new location for her husband's job and remained totally unemployed so that she could take care of the parties' two children. The wife continues to have teaching credentials and has applied in all local school districts for teaching jobs.
Finding of Fact 2.12 (in part).[1]
The trial court specifically found Ms. Pape was making reasonable efforts toward finding a full time teaching position at the time of trial. CP at 5.
As part of the property disposition, the trial court awarded the family home to the mother, with the understanding that she intended "to sell the home immediately after entry of the Decree of Dissolution." Finding of Fact 2.8(a). The mother later testified by declaration that she and the father both knew she would not stay in the home after the marriage ended, but that she and the children would move to a home that was less expensive to maintain, after she had found a job. CP at 79-80. She also states that she and the father knew that after the move to a new home their daughter, who was in school, would not be attending the same school. CP at 79.
On July 19, 1994, in its written decision, the trial court states: "The parties have agreed upon a Parenting Plan, which the Court will adopt and sign when presented." CP at 2. However, the decree of dissolution was not entered until October 7, 1994, nearly four months later. CP at 118. With respect to the children's care, the decree provides only "The parties shall comply with the Parenting Plan signed by the court. The Parenting Plan signed by the court is approved and incorporated as part of this decree." CP at 122.[2]
The Permanent Parenting Plan is divided into nine sections. The first allocates decision-making responsibilities between the parents. The second sets forth the children's residential schedule. Section VI contains a clear geographic restriction, which is not at issue here, and which reads as follows:

VI. REMOVAL OF CHILDREN FROM STATE
A. A parent shall not move the residence of the children from the State of Washington except by the advance written approval of the other parent *1123 or by court order entered after notice of hearing having been given to the other parent.
CP. at 67.
In contrast, the relocation "restriction" which is the subject of this action is included in the decision-making section of the plan. That section provides, in pertinent part:

I. DECISION-MAKING
A. GENERAL
1. The parents desire to remain responsible and active in the child[ren]'s growth and development consistent with the best interests of the children. The parents will make a mutual effort to maintain an open, ongoing communication concerning the development, needs and interests of the children and will discuss together any major decisions which have to be made about or for the children.
1.1 The residential parent shall have authority to make day-to-day decisions affecting the children's welfare; however, major decisions concerning the children's welfare shall be made by both parties.
2. Major decisions are the following:
2.1 Non-emergency medical and/or dental care and providers thereof.
2.2 Change of school not mandated by authorities.
2.3 Moving the children or daycare outside of an area including all of Pierce County and a ten-driving radius outside of the borders of Pierce County.
CP at 61 (emphasis added).
Section VIII of the plan designates arbitration as the process for resolving disputes when the parents are unable to come to an agreed decision on their own. CP at 67.
The residential schedule set forth in the plan provides that the father will have the children residing with him every other weekend and alternate Monday evenings. He additionally is scheduled to have one of the children each Tuesday night. The children reside with the mother at all other times, except during specified vacation periods. CP at 63-64.
In mid-August 1994, the mother was offered a full-time teaching job in Camas, Washington, for the 1994-95 school year. CP at 20. The mother testified she inquired about jobs or applied for jobs in the Tacoma area, but was not offered an interview in any school district but Camas. CP at 84-85. The father claims the mother could have found a teaching job closer to Tacoma if she had been "genuinely trying to." CP at 48.
Shortly after she was offered the job in Camas, the mother filed a motion for an order permitting her to move to Camas with the children, pending arbitration of the relocation issue. CP at 9. (The arbitrator designated by the plan was not available until the day that school started. CP at 11.) The mother simultaneously filed a petition to modify the residential provisions of the parenting plan, pursuant to the minor modification statute. Former RCW 26.09.260(4).[3] CP at 12-15. The mother proposed extending the children's time with the father during summer vacation to six weeks (from 10 days) and to include every three-day holiday weekend during the school year, in order to make up for the father's loss of mid-week time with the children. CP at 83. Although the trial court's written decision in the dissolution trial was filed in July 1994, the decree of dissolution had not yet been entered at the time the motion for modification was made.[4] A series of temporary motions and hearings resulted in the approval of the mother's move to Camas, pending a hearing by the judge who tried the dissolution action.
*1124 The father responded to the mother's motions with his own motion, asking the court to order the parties to abide by the permanent parenting plan. CP at 23. The father's position is that the parenting plan "provides that the children will not be moved outside a 10 mile radius from Pierce County." CP at 25-26. The father interprets the mutual decision-making section of the plan as requiring agreement of the parties before action may be taken by the mother. CP at 41. He argued that stability and continuity of environmentschool, child care, relationships, and activitieswere in the children's best interests, and that a move to Camas by the mother was not. CP at 42-44.
On October 7, 1994 the decree of dissolution, approving and incorporating the parties' Permanent Parenting Plan, was entered. CP at 118-28. At that time, the trial judge also granted the mother's motions for a temporary order permitting her to move with the children to Camas and for a minor modification of the residential provisions of the parenting plan. CP at 129-30. The trial court determined that the offer of a teaching job for the 1994-95 school year was an involuntary change in the mother's work schedule, which necessitated a change of residence and, therefore, was a ground for modifying the parenting plan, pursuant to former RCW 26.09.260(4)(b). CP at 129-30. The father appealed.
While the appeal was pending, the mother worked as a teacher in Camas, during 1994-95, and then was offered another teaching job in Clark County for the 1995-96 school year. CP at 148, 151. In September 1995, she asked the trial court for permission to continue living in Clark County. CP at 145. This request was granted in an order entered October 13, 1995, "pending final determination in this cause." CP at 152. At some point, the father apparently had moved for modification of primary placement from the mother to himself. (See, e.g., CP at 153, order referring to father's motion.) There is no copy of this motion in the record on review, and the father has not pursued it.
The father then filed a motion for discretionary review of the October 1995 order. The Court of Appeals Commissioner denied review, ruling that the first order (October 7, 1994) had expired by its own terms and that the father had failed to show a basis for accepting review of the second order (October 13, 1995). However, the Commissioner's ruling was modified by the Court of Appeals, which granted review and heard oral argument in June 1997. In November 1997, the Court of Appeals, in a published opinion, reversed and remanded the case to the trial court for a hearing to determine (1) whether the mother's move to Clark County was harmful to the children, beyond the distress typically associated with relocation (i.e., In re Marriage of Littlefield standard) and (2) if so, whether the father should be named the primary residential parent, especially if the mother was unwilling or unable to return to Pierce County, or (3) if not, what adjustments to the residential schedule would be necessitated by the move. Both parties moved for reconsideration of this decision.
While the motions for reconsideration were pending, the trial court, Judge Roseanne Buckner presiding, conducted the hearing ordered by the Court of Appeals on remand. On August 4, 1998, Judge Buckner entered findings of fact and conclusions of law. The trial court found that the children spend time with their father on a regular basis; the father's ability to spend extended time with the children is limited by his work obligations and the notice requirement of the parenting plan; the children's close relationship with their paternal aunt was affected by the move to Clark County, since the aunt was unable to spend as much time with them as she had prior to the move; the children are currently well-adjusted, happy, and show no overt adverse impact due to the move with their mother; the mother's move from Pierce County to Clark County with the children was not harmful to the children beyond the distress normally accompanying travel or infrequent contact with their father. (Judge Buckner's findings and order are included in the Court of Appeals file.)
On August 17 1998, the Court of Appeals heard an extended oral argument on the parties' motions for reconsideration. The Court of Appeals then granted reconsideration, voided Judge Buckner's rulings, withdrew *1125 the Court of Appeals November 1997 opinion, and substituted a new opinion. In its new opinion, In re Marriage of Pape, 93 Wash.App. 96, 968 P.2d 417 (1998), review granted, 137 Wash.2d 1019, 980 P.2d 1284 (1999), the Court of Appeals found that, in exchange for the father giving up his right to litigate the parenting issues, the mother agreed to the imposition of a geographic restriction on where she could live with the children, as well as a restriction on the children's daycare and schooling. Pape, 93 Wash.App. at 104, 968 P.2d 417. The Court of Appeals interpreted the parenting plan as requiring the father's consent before the mother could move with the children. Pape, 93 Wash.App. at 104, 968 P.2d 417. The Court of Appeals also held that Littlefield did not apply to the facts of this case because, unlike the father in Littlefield, Mr. Pape did not seek to restrict where his children's mother lived, but instead sought "to enforce the parenting plan requirement that the children reside in or within 10 miles of Pierce County unless both parents consent to their moving away." Pape, 93 Wash.App. at 107, 968 P.2d 417 (emphasis added). Finally, the Court of Appeals held that the trial court erred in applying the minor modification statute, former RCW 26.09.260(4)(b), without finding that it was "in the children's best interests to live, to attend school, and to go to daycare in Clark County rather than within 10 miles of Pierce County." Pape, 93 Wash.App. at 109, 968 P.2d 417.
The Court of Appeals decision conflicts with a Division Three case, In re Marriage of Flynn, 94 Wash.App. 185, 972 P.2d 500 (1999) and with a Division One case, Bower v. Reich, 89 Wash.App. 9, 964 P.2d 359 (1997). The mother argues the decision also conflicts with Littlefield. We granted the petition for review.

ISSUE
What standard should a trial court apply in deciding a motion to modify the residential provisions of a parenting plan when the reason for the modification is the proposed geographic relocation of the primary residential parent and when the parent who will be left behind requests that the primary residential parent be ordered to live within a certain geographic area?

ANALYSIS
The inherent difficulty of relocation cases, coupled with the timing and the complex procedural history in this case, has complicated the legal arguments presented by the parties and has resulted in confusing or conflicting orders entered in this case. In order to understand what is not at issue, it is helpful to examine the nature of the motions before the trial court and the scope of the trial court's rulings, before discussing the primary issue raised by this appeal.
The mother filed two actions that initiated this current dispute between the parties. One was a petition to modify the residential provisions of the parenting plan. CP at 12-15. The other was a motion for a temporary order permitting the mother to move with the children to Clark County, pending an opportunity to invoke the dispute resolution process set out in the parenting plan. CP at 9-11.
The mother's motion for the temporary order was not a petition to modify the parenting plan. Rather, it was an attempt to comply with the mutual decision-making and alternative dispute resolution provisions of the plan. The father's argument that the mother requested modification of these provisions is not supported by the record.
The parties' parenting plan provides that a move outside a 10-mile radius of Pierce County is a "major decision" affecting the children and that it must be made by both parties. CP at 61. Where the parties are unable to reach an agreement, the parenting plan provides a mechanism for resolution of the impasse. In this case, that mechanism is arbitration by a specific individual. CP at 67. See RCW 26.09.184(4)(c) (when mutual decision-making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the dispute resolution process); RCW 26.09.184(3)(b) (the parents shall use the designated process to resolve disputes relating to implementation of the plan unless an emergency exists).
*1126 The parents were not able to agree on this issue. Compliance with the plan required submission of the dispute to the arbitrator. The arbitrator was not available before the mother's new job was scheduled to begin and, therefore, she requested an order from the court authorizing her to temporarily relocate with the children, pending arbitration. CP at 9. The parties conceded at oral argument before the Court of Appeals that they had waived their right to arbitration, permitting the trial court to make the decision for them instead. In re Marriage of Pape, 93 Wash.App. at 101 n. 4, 968 P.2d 417. The trial court resolved this matter by permitting the mother to reside with the children in Clark County during the 1994-95 school year. CP at 130. The trial court order terms this a "temporary modification." However, the intent of the order appears to be that the mother could move "temporarily" rather than permanently. This was not a modification of the plan, but compliance with its terms.
The timing of the mother's request for permission to move and for modification of the residential provisions also creates particular problems in this case, as does the parties' failure to separate the decision-making aspect of the case from the residential modification aspect. The father argues it is unfair to modify, rather than enforce, the terms of the newly ordered parenting plan. The father argued to the Court of Appeals that he gave up his right to litigate for the primary care of the children in exchange for the mother's promise not to take the children outside of the Pierce County area.[5] This allegation of the negotiation history between the parties is not supported by the record on review. In fact, both parties gave up their right to litigate the terms of the agreement.
The father's argument that the parenting plan should be "enforced" as written, misconstrues the nature of parenting plans in general and the specific terms of his own plan. The final parenting plan is intended to be a detailed "work plan"or guidefor parents to follow after the decree of dissolution is entered. 2 WASHINGTON STATE BAR ASS'N, FAMILY LAW DESKBOOK § 45.3(1) (rev. ed. 1996) (hereafter referred to as FAMILY LAW DESKBOOK).
The major purpose behind the requirement of a detailed permanent parenting plan is to ensure that the parents have a well thought out working document with which to address the future needs of the children....
FAMILY LAW DESKBOOK § 45.3(3).
In this case, the parents' plan provides for a process to be followed when changes affecting the children arise. That process is to try to work together and agree with respect to major decisions and, where agreement is not possible, to submit the issue to an arbitrator for resolution. The parties here agreed to waive the arbitration procedure in favor of judicial determination of this issue. In re Marriage of Pape, 93 Wash.App. at 101 n. 4, 968 P.2d 417.
Because the mother attempted to follow the plan with respect to decision-making and arbitration, we deem it unnecessary to give separate consideration to the father's argument that the decision-making provisions of the plan were modified or that they should be enforced as written. The father's argument that the best interests of the children required their remaining in the Pierce County area is included within the analysis set forth below.

RELOCATION
Relocation cases "present some of the knottiest and most disturbing problems that our courts are called upon to resolve." Tropea v. Tropea, 87 N.Y.2d 727, 736, 665 N.E.2d 145, 148, 642 N.Y.S.2d 575 (1996). The interests of the primary residential parent in moving to a new location, where educational or work opportunities are better, are pitted against those parents who will be left behind and those who have a strong desire to maintain frequent and regular contact with the child. Additionally, the interests of the child may or may not conflict with the interests of one or both parents. See Tropea, 87 N.Y.2d at 736, 642 N.Y.S.2d 575, 665 N.E.2d *1127 145; Ireland v. Ireland, 246 Conn. 413, 421, 717 A.2d 676 (1998). Cases involving the geographic relocation of the primary residential parent following dissolution are intensely emotional, and the issue has been extensively litigated during the last decade. See In re Marriage of Littlefield, 133 Wash.2d at 47, 940 P.2d 1362. The issue has been called "one of the hottest current issues in family law." Norma Levine Trusch, Commentary, Relocation of Children After Divorce: The Winds of Change, 18 No. 4 Fair$hare 2 (Apr. 1998) (hereafter referred to as Trusch). Change after dissolution of marriage is inevitable, however, and it is well accepted that
[p]arents who separate or divorce are taking but one step in a series of important and often difficult life choices that affect their own futures and those of their children. Sooner or later, one or both may remarry, have new children, change jobs, change careers, or relocate. There is nothing new in this, of course, but both the frequency with which families face these changes and the attitudes we hold about them are.
Carol S. Bruch & Janet M. Bowermaster, The Relocation of Children and Custodial Parents: Public Policy, Past and Present, 30 Fam. L.Q. 245, 246-47 (1996) (footnote omitted) (hereafter referred to as Bruch & Bowermaster).
It is unrealistic to expect that any family in contemporary American society, whether intact or divorced, will remain in one geographic location for an extended period of time, or that only one parent will wish to move. Because of the instability and unpredictability of the employment market..., the high incidence of remarriage, and the high incidence of second divorces, repeated, separate moves by each parent are coming to represent the norm. Children of divorce often experience many changes in neighborhoods, schools, and friends. We have long had reports that school and residential changes occur more frequently for children in divorced families than they do for children in intact families....
The child of divorce will also experience changes within the family unit, including remarriage, new step-siblings, new half-siblings, and new networks of extended family relationships and mobility among the extended family members. Given the expected mobility in the residence of both parents, the child's community or network of support at the time of divorce (or at the time of a relocation request) cannot realistically be regarded as a continuing source of his or her stability. Public policy designed to protect the child should consider these expectable and inevitable repeated changes in the geographic location and family relationships of both parents during the years following divorce and endeavor to provide safeguards within realistic expectations.
Judith S. Wallerstein & Tony J. Tanke, To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce, 30 Fam. L.Q. 305, 310 (1996) (footnotes omitted) (hereafter referred to as Wallerstein & Tanke).
Statistics indicate that a significant number of Americans divorce and a significant number move each year. See Bruch & Bowermaster, supra, at 249 (stating that each year approximately one American in five changes residences); Sanford L. Braver & Diane O'Connell, DIVORCED DADS: SHATTERING THE MYTHS (1998) (hereafter referred to as Braver & O'Connell) (in one-third of the families in their study, one or both parents relocated outside of the metropolitan area within three years of divorce). Additionally, it is estimated that approximately 70 percent of all divorced women will remarry, and approximately 50 percent of women who remarry during their childbearing years have children with their new husband. Bruch & Bowermaster, supra, at 249 n. 11.
Statistics also show that during the past two decades there has been a significant increase in the sharing of parenting responsibilities during marriage, and a strong desire on the part of nonprimary residential parents to continue sharing in those responsibilities after the marriage ends. See generally Braver & O'Connell, supra; Trusch, supra, at 3. See Littlefield, 133 Wash.2d at 48, 940 P.2d 1362.
In the past, the judicial response to these competing trends was to place more and *1128 more restrictions on the ability of the primary residential parent to move with the child. See Trusch, supra, at 3; Arthur B. LaFrance, Child Custody and Relocation: A Constitutional Perspective, 34 U. Louisville J. Fam. L. 1 (1995-96). Then, in 1996 and 1997, a number of state supreme courts, including this one, began articulating new standards for relocation cases. See, e.g., In re Marriage of Littlefield, 133 Wash.2d 39, 940 P.2d 1362; In re Marriage of Burgess, 13 Cal.4th 25, 913 P.2d 473, 51 Cal.Rptr.2d 444 (1996); Tropea v. Tropea, 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145. See also Bruch & Bowermaster, 30 Fam. L.Q. 245 (providing a summary of state decisions). The courts' holdings in these cases have been called "groundbreaking and controversial." Trusch, supra, at 3.
The "controversy" triggered by these decisions is based on a "serious gap" between popular perceptions as to what is in a child's best interests and a growing body of social science literature that has identified the child's relationship with his or her primary caretaker as the single most important factor affecting the child's welfare, when the child's parents do not live together. Bruch & Bowermaster, supra, at 247. In a comprehensive study of this state's Parenting Act, chapter 26.09 RCW, commissioned by the Washington State Gender and Justice Commission and released in June 1999, researcher Diane N. Lye reviews all of the scholarly literature on the subject.[6] Her research indicates:
Children of divorce do better when the well-being of the primary residential parent is high. Primary residential parents who are experiencing psychological, emotional, social, economic, or health difficulties may transfer these difficulties to their children and are often less able to parent effectively.
Diane N. Lye, Washington State Parenting Plan Study: Report to the Washington State Gender and Justice Commission and Domestic Relations Commission 4-10 (June 1999).
Dr. Lye's report also concludes:
[T]he weight of evidence does not support the view that higher levels of child-nonresidential father contact are automatically or always beneficial to children. However, the weight of the evidence also does not suggest that, absent parental conflict, high levels of child-nonresidential parent contact are harmful to children.
Washington State Parenting Plan Study at 4-17.[7]
Dr. Judith Wallerstein more directly concludes:
In their attempts to justify changes in custody in relocation cases, judges have sometimes applied a seemingly irrebuttable presumption that frequent and continuing access to both parents lies at the core of the child's best interests. Therefore, it is important to state very clearly that the cumulative body of social science research on custody does not support this presumption. While the psychological adjustment of the custodial parent has consistently been found to be related to the child's adjustment, that of the noncustodial parent has not. Neither is the amount of visiting of the noncustodial parent consistently related to the child's adjustment.
Washington's legislative and judicial policies have long recognized the importance of "custodial" continuity to a child who does not live with both parents. This remained true after the Parenting Act repealed the custody statute. In re Marriage of McDole, 122 Wash.2d 604, 610, 859 P.2d 1239 (1993) (custodial changes are viewed as highly disruptive to children and there is a strong presumption in favor of custodial continuity and against modification); George v. Helliar, 62 Wash.App. 378, 382, 814 P.2d 238 (1991); In re Marriage of Roorda, 25 Wash.App. 849, 851, 611 P.2d 794 (1980). RCW 26.09.260(1), the statute governing modification of parenting plans, places a heavy burden on a parent *1129 seeking to change the primary residential placement of a child.
Not all modification actions are aimed at changing the child's principal residence, however. To facilitate "minor" changes, the Legislature has enacted RCW 26.09.260(5)[8] providing a procedure for making minor adjustments to parenting plans, without imposing the heavy burden placed upon those seeking a change in the child's principal residence.
RCW 26.09.260, provides, in pertinent part:
(1) Except as otherwise provided in subsections (4), (5), (7), and (9) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.
(2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
(a) The parents agree to the modification;
(b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan;
(c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
(d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan, or the parent has been convicted of custodial interference in the first or second degree under RCW 9A.40.060 or 9A.40.070.
....
(5) The court may order adjustments to the residential aspects of a parenting plan upon a showing of a substantial change in circumstances of either parent or of the child, and without consideration of the factors set forth in subsection (2) of this section, if the proposed modification is only a minor modification in the residential schedule that does not change the residence the child is scheduled to reside in the majority of the time and:
(a) Does not exceed twenty-four full days in a calendar year; or
(b) Is based on a change of residence or an involuntary change in work schedule by a parent which makes the residential schedule in the parenting plan impractical to follow; ...
This law is unambiguous. With respect to relocation cases, RCW 26.09.260(5) permits adjustments to the residential schedule set forth in a parenting plan upon a showing by the primary residential parent of a substantial change in circumstances of the mother, the father or the child; that the modification of the residential schedule is minor; that the modification does not change the principal residence of the child; and that the basis for the motion is a change of residence or work schedule.
The father in the present case argues that the intent of the Parenting Act is to eliminate distinctions between "custodial" and "non-custodial" or "primary" and "secondary" parents so that only "parenting" of the children is left. In essence, he argues that a designation of "primary residential parent" is inconsistent with the philosophy behind the Parenting Act. The father is correct that the Parenting Act replaced the terms "custody" and "visitation" with the concepts of "parenting plans" and "parental functions." Littlefield, 133 Wash.2d at 51, 940 P.2d 1362; In re Marriage of Kovacs, 121 Wash.2d 795, *1130 800-01, 854 P.2d 629 (1993). However, it is necessary, in some cases, to distinguish between the relationships the child has with each parent in order for the law to serve the best interests of the child. To that end, cases do refer to the "primary residential parent." See, e.g., Littlefield, 133 Wash.2d at 55, 940 P.2d 1362; In re Marriage of Jensen-Branch, 78 Wash.App. 482, 899 P.2d 803 (1995). Further, RCW 26.09.260, as amended in the last legislative session, refers to the "nonprimary residential parent." Laws of 1999, ch. 174, § 1(6)-(8).
For purposes of applying the modification statute, the "primary residential parent" is the one with whom the child resides the majority of the time. Laws of 1999, ch. 174, § 1(5).
While this court has not yet had an opportunity to interpret the minor modification statute, all three divisions of the Court of Appeals have interpreted former RCW 26.09.260(4) as it pertains to relocation cases. Each has interpreted the statute in light of our opinion in Littlefield.
Littlefield involved an initial parenting plan in which the trial court designated the mother as the primary residential caretaker of the child and then ordered the mother to move her home from California to Washington to facilitate frequent contact between the child and the child's father. We reversed and held that, under the terms of the Parenting Act, a trial judge has no authority, in entering an initial parenting plan, to limit or restrict a parent's choice of residence, unless the restriction falls within the scope of RCW 26.09.191. Littlefield, 133 Wash.2d at 55, 940 P.2d 1362. The court held:
Where justified by the facts, RCW 26.09.191(3)(f) or (g) permits a trial court to find that the primary residential parent's relocation would harm the child. We interpret RCW 26.09.191(3) to require more than the normal distress suffered by a child because of travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage.
Littlefield, 133 Wash.2d at 55, 940 P.2d 1362.
A parenting plan's provisions are subject to modification as the circumstances of the parents and of the children change. RCW 26.09.260....
The Parenting Act attempts to afford parents the opportunity to continue parenting their children after dissolution of the marriage. However, the practical result of a marriage dissolution is that parenting and family life will not be the same after dissolution. This is so even though a trial court may believe it is in the "best interests of the child" to continue to live in the same family unit. A child cannot escape the reality that his or her family is no longer the same.
Littlefield, 133 Wash.2d at 56-57, 940 P.2d 1362. See also Taylor v. Taylor, 849 S.W.2d 319, 328 (Tenn.1993) ("It is clear, after all, that the child's true best interest is no divorce in the first place, obviating the possibility of a geographical break-up of the family, as well as the legal break-up entailed by the divorce."); Wallerstein & Tanke, supra, at 314-15 ("Court intervention designed to maintain the geographical proximity of divorced parents is fundamentally at odds with a divorce decision that necessarily determines that each parent will rebuild his or her life separate from the other. To require divorcing parents to spend their lives in the same geographical vicinity is unrealistic."); Joseph Goldstein et al., THE BEST INTERESTS OF THE CHILD: THE LEAST DETRIMENTAL ALTERNATIVE 37-38 (1996) ("We cannot design a system which shields the non-custodial parent from any change in the custodial parent's life which may affect the exercise of access.... We must also forcefully acknowledge that the custodial parent's best interests are inextricably tied to those of the child.... The child's best interests must be assessed not from the perspective of the parent seeking to preserve access, but from that of the child entitled to the best environment possible.").
The Court of Appeals in Pape held Littlefield did not apply because the parents in Pape had agreed that the children would live in the area of Pierce County "unless both parents consent" to their moving away. As stated above, this is a misconstruction of the parenting plan entered in this case. The Court of Appeals also held that the minor *1131 modification provisions of RCW 26.09.260 required the trial court to base a decision to modify the parenting plan on the best interests of the children. The Court of Appeals instructed the trial court, on remand, to enforce the parenting plan, unless it determined that it was in the children's best interests to live, to attend school, and to go to daycare in Clark County rather than within 10 miles of Pierce County. Pape, 93 Wash.App. at 107-09, 968 P.2d 417. The Court of Appeals also held the minor modification provisions of the statute should not be read to permit an alteration of the plan without regard to the best interests of the child. The Court of Appeals held that such an interpretation of the statute would invite parenting plan modifications that conflict with the Legislature's clearly stated policy of serving children's best interests by fostering continuity of parent-child relationships and stability of parenting plans. Pape, 93 Wash.App. at 106, 968 P.2d 417.
In Bower v. Reich, Division One considered an action in which the mother, who was the primary residential parent, petitioned the trial court for a minor modification of the parenting plan, under former RCW 26.09.260(4)(b)(iii), so that she could move from Washington to California to attend school and to pursue a career. In reversing the trial court's denial of her motion, the Court of Appeals held the minor modification statute applied to a change of residence, even out of state. The court also applied the rationale of Littlefield, and held that the trial court could restrict the mother from moving only if it found that the child would suffer more distress than normally attends the hardships of travel and distance from a parent. Bower, 89 Wash.App. at 17-18, 964 P.2d 359. Division Three similarly held that former RCW 26.09.260(4)(b)(iii) applied to a motion to modify based on a change of residence. In re Marriage of Flynn, 94 Wash.App. 185, 972 P.2d 500. The Court of Appeals in Flynn remanded for a hearing consistent with the Littlefield standard.[9]
We find Division One's decision in Bower most consistent with statutory and case law.
The Court of Appeals in Pape understandably confuses the "best interests" standard considered in making an initial primary residential placement with the standard applicable to minor modifications. A trial court making an initial placement of the child considers many factors that impact the child's life in order to determine the best interests of the child. See RCW 26.09.187(3). A trial court hearing a modification action, on the other hand, presumes the best interests of the child require the primary placement remain intact. RCW 26.09.260(1). In a modification action the presumption is in favor of "custodial" continuity, not environmental stability or environmental continuity. It is only where the nonprimary residential parent overcomes that presumption by showing continued placement with the other parent is not in the child's best interest that the principal residence of the child may be changed. In a minor modification, the decision does not so dramatically impact the child's life. Because the best interests of the child with respect to the primary residential placement have already been determined, the court, in a minor modification, need not reexamine the placement to consider whether it continues to be in the child's best interests.
We are aware of and are sympathetic to the difficulties faced by parents whose children move, with the other parent, some distance away. However, these difficulties are a consequence of the dissolution of marriage. Once the decree of dissolution is entered, a trial court's involvement in decision-making for the family is minimized.
The court's role in a family's life following dissolution of marriage is not to review every parenting decision to determine if it is in the child's "best" interests. Once the court has determined the best residential placement of *1132 the child, based on the best interests standard set forth in the statute, the important job of the court is finished. The court does not again become significantly involved in parenting decisions, unless the child's well-being is seriously threatened by parenting decisions. A change in the location of the child's place of residence, with the primary residential parent, generally does not pose such a serious threat.

CONCLUSION
We hold that the meaning of "minor modification" is included in the language of RCW 26.09.260(5), and its predecessor, former RCW 26.09.260(4). A minor modification, in a relocation case, is an adjustment to the residential provisions of a parenting plan which is necessitated by a change in residence or by an involuntary change in work schedule.
Where the petitioning parent is the primary residential parent, that parent must show a substantial change in the circumstances of the mother, the father or the child. This change must be a bona fide change in circumstances, such as a change in employment or a new employment or educational opportunity. Additionally, the petitioning parent must show that the modification of the residential schedule will not change the placement of the child with the primary residential parent. As an aid to the court, the petitioning parent should propose a revised schedule for residential time and other kinds of contact aimed at helping to maintain the relationship between the child and the parent who is left behind.
If the petitioning parent meets the statutory standard, the other parent must be afforded an opportunity to prove that the proffered reason for the move is not a bona fide reason. For example, the parent resisting the move might show that the reason is merely a pretext for minimizing the child's contact with the parent who will be left behind. The existence of other options, "better" or not, which may be available to the relocating parent, is not, alone, a reason to deny the motion. The resisting parent also should have an opportunity to prove that the primary residential parent should be restricted from moving away because the detriment that would be suffered by the child as a result of the move is beyond the normal distress suffered due to travel, infrequent contact with a parent, or other hardships which predictably result from a relocation following dissolution. Littlefield, 133 Wash.2d at 55, 940 P.2d 1362.
The trial court need not reassess which parent should be the primary residential parent, as that determination will already have been made and because of the strong presumption that custodial continuity is in the child's best interests.
In this case, through the series of proceedings, the mother demonstrated a substantial change in her own circumstances sufficient to establish adequate cause, under RCW 26.09.270. The fact that she was offered just one teaching job for the 1994-95 school year, and that it necessitated a move to Clark County, was sufficient under the statute to invoke the provisions of the minor modification statute. The adjustments to the residential schedule of the parenting plan proposed by the mother also were minor and did not result in a change in the children's primary residential parent.
The father's allegation that the reason for the move is not bona fide because the mother did not earnestly try to find a job in the Pierce County area was properly rejected by the trial court. In the remand hearing before Judge Buckner, the father had an opportunity to prove the detrimental impact of the move on the children, and was unsuccessful in showing any unusual harm. Therefore, the modification order in this case is affirmed.
The Court of Appeals is reversed; the orders of the trial court with respect to the mother's relocation are affirmed.
SMITH, JOHNSON, TALMADGE, and IRELAND, JJ., concur.
MADSEN, J. (dissenting).
The majority's opinion loses sight of the policy of the Parenting Act, chapter 26.09 RCW, which "recognizes the fundamental importance *1133 of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." RCW 26.09.002 (emphasis added). I would affirm the unanimous Court of Appeals' decision in this case. Accordingly, I respectfully dissent.
I would start by honoring the language of the parenting plan agreed upon between these two parties. It required that the parents "discuss together any major decisions which have to be made about or for the children" and further provided that "major decisions concerning the children's welfare shall be made by both parties."[1] Clerk's Papers (CP) at 61. "Major decisions" were defined to include the following: "Change of school not mandated by authorities" and "[m]oving the children or daycare outside of an area including all of Pierce County and a ten-mile driving radius outside of the borders of Pierce County." Id. Although Johnson-Pape quite unilaterally moved the children well outside of a 150-mile driving radius of Pierce County, the majority avoids giving effect to the language forbidding her from doing so without Pape agreeing to, or even discussing with her, that major decision. Instead it writes that "we deem it unnecessary to give separate consideration to the father's argument that the decision-making provisions of the plan were modified or that they should be enforced as written." Majority at 1126. In its indifference to the substantive nature of parenting plans, the majority heedlessly sweeps aside the mandate of RCW 26.09.260(1), which provides that
the court shall not modify a ... parenting plan unless is finds, upon the basis of facts that have arisen since the ... plan or that were unknown to the court at the time of the ... plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.
(Emphasis added.)
The majority agrees with Johnson-Pape that this case involved nothing more than a "minor modification" to a parenting plan, and, accordingly, finds that it falls within an exception to RCW 26.09.260(1). However, this contention, on its face, defies credulity not to mention the plain letter of the exception:
The court may order adjustments to the residential aspects of a parenting plan upon a showing of a substantial change in circumstances of either parent or of the child ... if the proposed modification is only a minor modification in the residential schedule that does not change the residence the child is scheduled to reside in the majority of time and:
....
(b) Is based on a change of residence or an involuntary change in work schedule by a parent which makes the residential schedule in the parenting plan impractical to follow....
RCW 26.09.260(5) (emphasis added). Although RCW 26.09.260(5) is an exception to the rigid standard for modification enunciated in RCW 26.09.260(1), it hardly seems applicable here. After all, it must be fairly conceded that this case involves a bit more than a "minor modification in the residential schedule [.]" RCW 26.09.260(5) (emphasis added). Prior to the change, "[t]he children's residential time with Pape was specifically tailored to accommodate monthly YMCA Indian Princesses father-daughter weeknight and weekend activities." In re Marriage of Pape, 93 Wash.App. 96, 98, 968 P.2d 417 (1998). As the Court of Appeals noted:
Here, the trial court's modification: (1) altered the children's residential schedule to accommodate Johnson-Pape's move to Clark County; (2) nullified the agreed geographic restriction on the children's residence; (3) changed the children's daycare; (4) changed the children's schooling; and (5) eliminated Pape's participation in the children's after-school mid-week activities, midweek residence with him, and Indian *1134 Princesses, all without Pape's consent, contrary to the express provisions of the plan.
Pape, 93 Wash.App. at 106, 968 P.2d 417.
While the first of the five effects that the Court of Appeals identifies could arguably pass muster under RCW 26.09.260(5), the other four would appear to exceed the statute's scope of permissible "minor modification" to a parenting plan's "residential schedule" aloneunless the words "residential schedule" are but a Trojan Horse in which a great many concepts are hidden. Moreover, Johnson-Pape's move to Camas preceded her motion to modify the residential schedule to accommodate an effect of her move. In essence, she first moved and then sought permission to move. Yet, even given the language of RCW 26.09.260(5), it would appear that Johnson-Pape could not have invoked the "change of residence" basis for modification under RCW 26.09.260(5)(b) until she was first, under the terms of a parenting plan that she had voluntarily entered into, given permission by Pape to change residence outside of the agreed geographical boundaries. Certainly, upon her being given permission, the court could then modify, under RCW 26.09.260(5), the residential schedule if nothing else. This was in keeping with the deal that she had struck with her ex-husband:
In exchange for a plan that balances parenting responsibilities, a parent may decide to forgo seeking primary designation. Here, rather than litigating which parent would provide the children's residence a majority of the time, Pape yielded the children's primary residence to Johnson-Pape. In exchange, Johnson-Pape agreed that she would not move the children 10 miles from Pierce County without his consent, thus ensuring Pape's frequent and substantial interaction with their children, including midweek.
Pape, 93 Wash.App. at 104, 968 P.2d 417 (footnote omitted).
This quid pro quo was hardly a contract of adhesion whose enforcement would work to Johnson-Pape's disadvantage. Instead, the initial parenting plan between Johnson-Pape and Pape was in accordance with the purposes of the Parenting Act, which "represents a unique legislative attempt to reduce the conflict between parents who are in the throes of a marriage dissolution by focusing on continued `parenting' responsibilities, rather than on winning custody/visitation battles." In re Marriage of Kovacs, 121 Wash.2d 795, 800, 854 P.2d 629 (1993). The act thus "attempts to encourage amicable settlements of disputes connected with separation and marriage dissolution." In re Marriage of Littlefield, 133 Wash.2d 39, 58, 940 P.2d 1362 (1997) (citing RCW 26.09.070). Here, however, the majority is punishing Pape for the very amicability the act is designed to foster. In exchange for ensuring "frequent and substantial interaction" with his children, Pape, 93 Wash.App. at 104, 968 P.2d 417, who were to be located in close proximity to his home, Pape ceded the primary residential parent role to his ex-wife. He could not have foreseen, in light of the majority's position today, the penalties in so acting.
The majority, sua sponte, evidences in dicta its disregard for a nonprimary residential parent's role in parenting his or her children. See, e.g., Majority at 1128. In so doing, it risks conveying the message that the law and facts of this case do not matter because any involvement by Pape in the lives of his children is simply irrelevant.[2] After this case, I cannot imagine why any nonprimary residential parent would have faith in the Parenting Act, or want to engage in the apparently empty exercise of negotiating a parenting plan.
The majority relies heavily on In re Marriage of Littlefield, and its apparent progeny in two other divisions of the Court of Appeals. However, Littlefield is distinguishable, and not only because it did not implicate the statutory provision at issue here. It *1135 is worth noting, though, that where Littlefield once mentions RCW 26.09.260 in passing, it writes that "a trial court is encouraged to require, as part of the parenting plan, that either parent notify the other of significant changes, such as an anticipated change of residence, sufficiently in advance of the change to facilitate a modification in the residential schedule of the child." Littlefield, 133 Wash.2d at 56, 940 P.2d 1362 (emphasis added). That notice, and much more, was required by the parenting plan in this case, so this guidance from Littlefield is now rendered as hollow as that guidance of the Parenting Act itself relating to parenting plans.
In addition to the fact that Littlefield is not based upon RCW 26.09.260, see majority at 1130, it is inapposite for other reasons as well. In Littlefield, the parents did not voluntarily enter into any parenting plan. See Littlefield, 133 Wash.2d at 44, 940 P.2d 1362. There the trial court itself created the parenting plan, ordering in that initial plan that the primary residential parent move from California to the Seattle area. See Littlefield, 133 Wash.2d at 45, 940 P.2d 1362. It also ordered that the child have frequent visits with the nonprimary residential parent, despite the fact that, unlike the plan at issue here, "[t]he parties did not knowingly and voluntarily agree to the frequent, weekly changes of their daughter's residence, and the parties had no history of cooperation and shared performance of parenting functions." Littlefield, 133 Wash.2d at 54, 940 P.2d 1362 (emphasis added). We held these actions to be outside of the trial court's authority. In the Division One case of Bower v. Reich, 89 Wash.App. 9, 964 P.2d 359 (1997), the parents had no agreed geographical restriction in their parenting plan, although the nonprimary residential parent sought to obtain one in preventing the primary residential parent from moving out-of-state, and Division Two is correct in this case in noting that "[u]nlike Littlefield and Bower, Pape has not sought to restrict where Johnson-Pape lives or works; rather, he seeks to enforce the parenting plan requirement that the children reside in or within 10 miles of Pierce county unless both parents consent to their moving away."[3]Pape, 93 Wash.App. at 107, 968 P.2d 417. After all, the "Parenting Act does not prevent parents from agreeing to geographic restrictions on their children's residence or schooling. Rather, ... the Parenting Act strongly encourages parents to reach agreement concerning postdissolution parenting agreements that serve the children's best interests and that foster both parents' continuing relationships with their children." Pape, 93 Wash.App. at 108, 968 P.2d 417 (citing RCW 26.09.002, RCW 26.09.184(1)(f)).
The Court of Appeals was correct when it stated that "parents should generally be able to enforce such agreed restrictions, so long as such enforcement is in the best interests of the children." Pape, 93 Wash.App. at 108-09, 968 P.2d 417. Therefore, I cannot agree with the majority of this court when it holds that after residential placement is determined a court's role in parenting decisions endsregardless of the terms of a parenting plan in a particular case"unless the child's well being is seriously threatened by parenting decisions"a threat that "[a] change in the location of the child's place of residence, with the primary residential parent, generally does not pose...." Majority op. at 1131-32 (emphasis added). This standard flies in the face of the Legislature's intent when it adopted the Parenting Act. I would, therefore, uphold the unanimous Court of Appeals' decision in this case and remand to the trial court to determine whether "modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260(1). Accordingly, I dissent.
SANDERS and ALEXANDER, JJ., concur.
NOTES
[1] The Findings of Fact and Conclusions of Law are not included in the certified record on appeal. However, they are included in the Court of Appeals file. None of the trial court's findings is challenged on appeal.
[2] Although several copies of the parenting plan are included in the record, none is signed by the parties, their counsel, or the trial judge.
[3] Former RCW 26.09.260(4) was amended and renumbered RCW 26.09.260(5) by Laws of 1999, ch. 174.
[4] The delay in entering the decree was apparently due to summer vacation schedules. CP at 16. While the sequence of events makes this individual case somewhat more complicated, it is not critical to our decision on what legal standards apply in relocation cases.
[5] The Court of Appeals made a finding of fact in favor of the father in this regard. In re Marriage of Pape, 93 Wash.App. 96, 104, 968 P.2d 417 (1998).
[6] The research analysis section of the Washington State Parenting Plan Study is just one section of this exhaustive study of the impact, effectiveness and challenges of the Parenting Act.
[7] The study notes that 12 studies have assessed the impact of the amount of time nonresidential fathers spend with the children on children's well-being. No studies were identified that assessed the impact of a nonresidential mother's involvement on child well-being. Washington State Parenting Plan Study at 4-14.
[8] As noted above, the modification statute was amended by Laws of 1999, ch. 174. The change in the law resulted in a renumbering of the paragraphs but does not otherwise significantly affect the law considered in this case. The 1999 Legislature also considered a Senate bill and a House bill that would have governed relocation actions following marriage dissolution. Neither bill passed.
[9] It is unclear in Flynn whether the modification requested by the mother, who was the moving party, would result in a change of primary residence for the child. The parenting plan in that case "essentially split residential time evenly by alternating weeks." Flynn, 94 Wash.App. at 187, 972 P.2d 500. In such circumstances, the minor modification statute would not normally be available to a parent seeking to relocate and the motion would have to be brought under RCW 26.09.260(1)-(2).
[1] More generally, the plan even stipulated that neither parent would "make plans and arrangements that would impinge upon the other parent's authority or time with the children without the express agreement of the other parent." Clerk's Papers at 62 (emphasis added).
[2] Indeed, the majority's opinion is heavy on broad social commentary and light on the law. The majority primarily relies upon, and quotes at great length, eight "authorities" that are either treatises, law review articles or reports. While these materials may make for interesting reading, they are certainly not law. As a result, the majority relies heavily on ER 201 but fails to take notice of what is truly at issue here: the facts involving these two specific parties.
[3] Even the majority frankly concedes that it is unclear what the second Court of Appeals case that it cites, In re Marriage of Flynn, 94 Wash.App. 185, 972 P.2d 500 (1999), stands for. See Majority at 1131 n. 9. Flynn, ostensibly predicated upon Bower and our holding in Littlefield erroneously asserts that Littlefield is a case "interpreting the minor modification provisions" of former RCW 26.09.260(4)(b)(iii) (renumbered as RCW 26.09.260(5)). Flynn, 94 Wash.App. at 187, 972 P.2d 500. Thus, its legal foundation is shaky. Furthermore, the facts make it apparent that there was no geographic restriction in the parenting plan involved in Flynn.