1 P.3d 600 (2000)
101 Wash.App. 13
In re the MARRIAGE OF Teena CHRISTEL, Appellant, and
John BLANCHARD, Respondent.
No. 41836-0-I.
Court of Appeals of Washington, Division 1.
June 5, 2000.
*602 Stella L. Pitts, Russell & Pitts, P.L.L.C., and Philip Tsai, for Appellants.
Cynthia B. Whitaker, Catherine W. Smith, Edwards, Sieh, Smith & Goodfriend, Seattle, for Respondent.
*601 APPELWICK, J.
John Blanchard filed an action to enforce the parenting plan for his six year-old son, Chase. John sought a restraining order to prevent Chase's mother, Teena Christel, from moving back to Tacoma from Seattle. To maintain Chase's enrollment in the same school, John sought a reversal of the residential schedule pending completion of the dispute resolution process. The existing parenting plan provided for joint decision-making on any change of school and dispute resolution if agreement was not reached. The trial court revised two commissioner's rulings. Teena now appeals the trial court's order. She asserts that the trial court impermissibly modified the dispute resolution process and impermissibly imposed a restriction on Teena's ability to move. We hold the court improperly modified the dispute resolution process and the residential schedule, but did not restrict the mother's right to move. We therefore reverse.

FACTS
Teena Christel and John Blanchard were married in 1988. Their son, Chase, was born in 1990. The couple divorced on June 2, 1993.
On August 3, 1992, the parties agreed, after mediation, to an interim parenting plan.[1] At that time, both parties lived in the Seattle area. The parties' agreed plan provided that Chase would live primarily with Teena, and spend one night a week and every other weekend with John. The plan contained a "RESIDENTIAL LOCATION" provision, which provided:
Each party acknowledges that this Parenting Plan was drafted and agreed in light of the Wallace Report and in particular the recommendations of Dr. Wallace that (a) each Parent maintain a domicile within a reasonable travel distance of the other (which he defines as no more than one-half hour, approximately, by ordinary and lawful driving, hereinafter referred to as "Reasonable [T]ravel [A]rea") (b) maintaining domiciles in Seattle and Tacoma is not feasible and is not in Chase's best interest, and (c) if the Mother agrees to maintain her domicile within such Reasonable Travel Area of the Father, Chase should live primarily with her.
The parties also agreed that a move by Teena outside the "Reasonable Travel Area" would trigger review or modification of the parenting plan:
In the event the Mother elects not to maintain her domicile within such Reasonable Travel Area, then this shall be considered a substantial change of circumstances not in the contemplation of the parties for purposes of qualifying for a review/modification of this Parenting Plan pursuant to RCW 26.09.260.
In addition, the plan included a dispute resolution provision requiring the parties to consult with each other regarding "Major Decisions," and to mediate any resulting disputes. A change of school and change of daycare were specifically listed as major decisions to be made jointly.
Shortly after agreeing to the parenting plan, Teena moved to Tacoma with Chase, who was then 22 months old. She moved secretly, without notifying John that she intended to change daycare providers, and without invoking the dispute resolution process in the parties' agreed parenting plan. Teena then commenced litigation to "rescind" the agreed 1992 parenting plan. On May 3, 1993, after an evidentiary hearing, Judge Carol Schapira[2] refused to rescind the parenting plan, and entered an order confirming the 1992 parenting plan as an interim parenting plan.
On August 2, 1994, Judge Schapira entered a permanent parenting plan. The permanent *603 parenting plan explicitly affirmed the recommendation that the parents live within a "Reasonable Travel Area" of each other. Nonetheless, although Teena was now living in Tacoma at the time the plan was entered, the permanent parenting plan maintained the child residing a majority of the time with Teena. The plan provides:
RESIDENTIAL LOCATION. This Parenting Plan was drafted in light of the Family Court, Wallace and Callner Reports and in particular the recommendations of Dr. Wallace and Dr. Callner that (a) each Parent maintain a domicile within a reasonable travel distance of the other (which he defines as no more than one-half hour, approximately, by ordinary and lawful driving, hereinafter referred to as "Reasonable Travel Area") (b) maintaining domiciles in Seattle and Tacoma is not feasible and is not in Chase's best interest and (c) if prior to September 1, 1994 the Mother maintains her domicile within such Reasonable Travel Area of the Father, Chase should live primarily with her. The Court finds that it is in the child's best interests to remain in the primary residential custody of the mother with substantial, frequent and regular visitation with the father.
If either party moves a substantial driving distance further away, issues of transportation and visitation including Father's residential schedule can be reviewed by the court if the parties cannot agree.
The plan also affirmed the dispute resolution provisions from the 1992 parenting plan, requiring the parents to make jointly any major decisions regarding the choice of Chase's school.
In July of 1996, after accepting a new job, Teena moved back to Seattle. Chase was now almost six years old, and the parties jointly agreed to send him to a private kindergarten near each parent's home.
In the fall of 1996, John learned that Teena was once again contemplating a move to Tacoma. He filed a motion to enforce the parenting plan and for a restraining order. John requested that the court (1) issue an ex parte restraining order preventing Teena from moving; (2) restrain Teena from moving pending completion of the dispute resolution process or, if she moved, reverse the residential schedule; (3) enforce the decree's provision requiring Teena to reside no more than one-half hour from John and not in Tacoma; and (4) in the alternative, commence an evaluation as provided in the decree.
On January 6, 1997, Superior Court Commissioner Harry R. Slusher entered an order providing that: (1) if Teena moved her current residence, the residential schedule would be reversed, and John would become the primary residential parent pending completion of the dispute resolution process; (2) the parties had to begin mediation; (3) the parties could not change Chase's school pending completion of the dispute resolution process (including a court hearing); and (4) if the parties could not agree, they had to file a petition for modification to address the residential schedule, transportation and other issues. The order stated that it would remain in effect "until completion of trial."
On July 25, 1997, Teena filed a motion to vacate and to clarify Commissioner Slusher's January 6, 1997, order. Teena specifically asked the court to find that a move to South Snohomish County, King County or North Pierce County would be within the reasonable travel area. Teena also filed a petition to modify the parenting plan, pursuant to Commissioner Slusher's order.
On August 22, 1997, after a hearing, Superior Court Commissioner Katharine C. Hershey entered an order providing that: (1) the portion of Commissioner Slusher's January 6 order holding that Teena would lose primary residential status if she moved, was an invalid modification of the parenting plan and void; (2) the school placement issue would be decided at a hearing on August 29; (3) the parenting plan did not prohibit Teena from moving beyond the "Reasonable Travel Area;" and (4) Teena could not be required to file a modification. Commissioner Hershey granted Teena a voluntary dismissal of her petition to modify. The court also found that the parties had participated in mediation as required by the parenting plan and Commissioner Slusher's order.
*604 After the August 29 hearing to decide the school placement issue, Commissioner Hershey ordered that: (1) Chase would remain in his existing parochial school and John would pay all tuition costs; (2) any party wishing to change Chase's school would need to begin mediation by May of the preceding school year; (3) transportation would remain the same as in the parenting plan; and (4) both parents would participate in school programs.
John filed a motion to revise portions of the August 22 order. He specifically asked the court to revise that portion of the order stating that Teena was not prohibited from moving beyond the "Reasonable Travel Area." Teena filed a motion for revision of the August 29 order. She specifically asked the court to revise that portion of the order denying her request to enroll Chase in the public school where she was soon to reside.
The motions for revision were decided without oral argument, and on November 13, 1997, the Honorable Harriett M. Cody in King County Superior Court entered an order, confirming in part and reversing in part, the August 22 and August 29 orders.
Judge Cody's revision left intact the following portions of the August 22, 1997, order: (1) that the issue of Chase's school placement for the 1997-98 school year would be decided at a hearing on August 29, 1997; (2) that paragraph 3.10 of the permanent parenting plan did not prohibit either parent from moving beyond the "Reasonable Travel Area" discussed in the plan, but could trigger review of certain provisions of the plan, absent agreement; (3) that Teena was not under proper order to file a modification petition; and (4) that Teena's modification petition was dismissed.
The revision left intact the following portions of the August 29, 1997, order: (1) that Chase should attend Our Lady of the Lake School, with the father paying all tuition costs; (2) that transportation responsibilities under the plan remained unchanged; and (3) that both parents should participate fully in school programs. These provisions of Judge Cody's order are not challenged.
The court order further revised and clarified the commissioner's August 29, 1997, order as follows:
A parent wishing to initiate a change in Chase's school enrollment shall be required to initiate dispute resolution by giving written notice to the other parent no later than January 15 for a proposed change in enrollment for the following academic year (no later that 90 days prior to such proposed change in the middle of an academic year). Mediation shall be scheduled no later than six (6) weeks from the date such written notice is received by the other parent and there shall be a minimum of three (3) hours mediation in one or more sessions, as determined by the mediator. Additional mediation sessions may be scheduled at the direction of the mediation. The deadline for noting a motion for court action on this issue, following completion of mediation, shall be June 1 prior to the beginning of the academic year for which such a change in school enrollment is sought. Failure of a parent to meet either the deadline for written notice to the other parent or the deadline for noting a motion following mediation shall be deemed a waiver of a parent's right to seek a change in school enrollment for the following academic year (absent written agreement of the other parent).
Assuming there are no changes in the current residences of either parent or in the logistics of their respective commutes, absent professional recommendations that a change in primary school enrollment is in Chase's best interest, neither parent (except by written agreement of the other parent) may initiate such dispute resolution to change Chase's current school enrollment at Our Lady of the Lake School sooner than January 1999.
The court order further revised the August 22, 1997, order as follows:
(2) Paragraph 1 of the Order of 1/6/97 remains in effect as follows: If, prior to completion of the dispute resolution process (set forth in paragraph 5.1 of the Permanent Parenting Plan of 8/26/94) in the future with regard to a contemplated change in the mother's current residence *605 (presently Juanita in King County) beyond a "[R]easonable [T]ravel [A]rea" (as defined in paragraph 3.10 of the PPP 8/26/94), the mother makes such a change in her current residence and that of Chase, the father shall become the primary residential parent of Chase on an interim basis and the residential schedule set out in the PPP shall be reversed and mother shall have father's residential schedule and vice versa, pending completion of the dispute resolution process and court action, if nessesary (emphasis added).
Teena now appeals these two latter provisions of Judge Cody's November 13, 1997, order.

ANALYSIS
Generally, a trial court's rulings dealing with the provisions of a parenting plan are reviewed for abuse of discretion. In re Marriage of Wicklund, 84 Wash.App. 763, 770, 932 P.2d 652 (1996). A trial court abuses its discretion if its decision is manifestly unreasonable, or based on untenable grounds or untenable reasons. Wicklund, 84 Wash. App. at 770 n. 1, 932 P.2d 652.
The rights of the parties as set forth in the decree were as follows:
4.3 MAJOR DECISIONS. A Major Decision is any decision involving the care, upbringing and development of [C]hase which could have a significant and material impact on him. The Parents shall consult with each other to an extent reasonable under the circumstances, with respect to all Major Decisions. Specific Major Decisions, and the authority to make same after appropriate consultation, are:
Choice of School joint
Change of School joint
Other educational major decisions Mother
Choice of health care/dental Mother
 providers
Choice of Day care/Preschool joint Mother, if emergency
Change of Day care/Preschool joint Mother, if emergency
Religious upbringing per 4.4 c. below

5. DISPUTE RESOLUTION
5.1 Dispute Resolution. If the Parents are unable to agree on a Major Decision, the matter shall be submitted to Dr. Stephen Feldman for mediation. If Dr. Feldman is unavailable and the parties are unable to agree on a replacement mediator, then the matter shall be mediated by Northwest Mediation Services. The cost of such mediation shall be allocated between the parties as may be determined by the mediator.
If the parties are unable to agree on a mutual resolution after a reasonable and good faith effort to mediate same, the matter shall be decided by the King County Family Law Court after timely notice of any motions and related hearings.
5.2 COMMENCING PROCESS. To start this process, a Parent shall notify the other in writing of: (a) the issues in dispute, (b) the proposed resolution(s), and (c) the arrangements made (time and place) to start the process. The other Parent shall respond in writing within 10 business days of receipt of such notice.
5.3 PREFERENCE. Preference shall be given to carrying out this Parenting Plan.
5.4 PLAN IMPLEMENTATION. The Parents shall use the designated process to resolve disputes, except those related to financial support, relating to Major Decisions unless an emergency exists.
If the court finds that a [P]arent has used or frustrated the dispute resolution process without good reason, the court shall award attorneys' fees and financial sanctions to the other [P]arent.
The parties have the right of review from the dispute resolution process to the superior court.
The trial court's order on appeal purports both to "revise" and "clarify" the dissolution decree. A clarification of a dissolution decree is "merely a definition of the rights which have already been given and those rights may be completely spelled out if necessary." Rivard v. Rivard, 75 Wash.2d 415, 418, 451 P.2d 677 (1969). A modification, on the other hand, occurs when a party's rights are either extended beyond or reduced from those originally intended in the *606 decree. Rivard, 75 Wash.2d at 418, 451 P.2d 677. A court may clarify a decree by defining the parties' respective rights and obligations, if the parties cannot agree on the meaning of a particular provision. E.g., Rivard, 75 Wash.2d at 419, 451 P.2d 677 (upholding court's clarification that father could have children on alternate weekends and one evening per week, when parties could not agree on meaning of divorce decree's phrase "reasonable visitation rights").
Teena argues that Judge Cody's August 29, 1997, order was not a clarification, but a modification of the dispute resolution and residential location provisions of the parenting plan. A permanent parenting plan may be changed in three ways: by agreement, by petition to modify, and by temporary order. No agreed change existed in this case. No petition to modify was pending. We need to determine if the challenged orders are temporary orders within the court's authority, are merely clarifications of the existing plan, or are impermissible modifications.
The parties' motions before the court were motions to enforce the decree, to enjoin the mother from moving, to temporarily reverse the residential schedule pending the conclusion of dispute resolution, to allow Teena to move and to allow Teena to change Chase's school enrollment. No motion to clarify the dispute resolution process was pending. No motion to modify the dispute resolution process was pending. The court may well have viewed its new provisions for dispute resolution as a solution to the underlying conflict between the parties. However, no party sought a change or clarification of the dispute resolution process.
The language used by the court in the order on appeal speaks to the future, not the present dispute, and includes a waiver of rights:
The Dispute Resolution Process in paragraph 5.1 of the PPP (8/26/94) is clarified and paragraph 2 of Order of 8/29/97 is revised, as to the process for determining changes in Chase's school enrollment in the future, as follows: ... (emphasis added).
. . .
Failure of a parent to meet either a deadline for written notice to the other parent or the deadline for noting a motion following mediation shall be deemed a waiver of a parent's right to seek a change in school enrollment for the following academic year... (emphasis added).
This language goes beyond explaining the provisions of the existing parenting plan. The language goes beyond filling in procedural details. The order on its face imposes new limits on the rights of the parents. It is not a clarification of the existing parenting plan. In addition, the language is clearly intended to apply into the future. It has all of the characteristics of a permanent change rather than a temporary order. The language used by the court amounts to a modification of the parenting plan. No action for modification was pending. The court abused its discretion with respect to the dispute resolution provisions contained in the order.
Teena also challenges the revision of the August 22, 1997, order arguing that it impermissibly restricts her right to move under In re Littlefield,[3] 133 Wash.2d 39, 940 P.2d 1362 (1997). The language provides:
If, prior to completion of the dispute resolution process (set forth in paragraph 5.1 of the Permanent Parenting Plan of 8/26/94) in the future with regard to a contemplated change in the mother's current residence ... (emphasis added).
The issue of whether the mother was restricted to residing within a "Reasonable Travel Area" had already been decided. Teena was not restricted as to where she lived. The language of the court is prospective and permanent. It purports to trigger a temporary change in the residential schedule upon a change of the mother's residence. This provision is an impermissible modification of the permanent parenting plan without a petition for modification having been filed. *607 Therefore, the court abused its discretion. The court's order must be vacated.
Having stricken the language on these grounds, we decline to consider whether the court has authority to order automatic reversal of residential schedules or to consider whether the principles of Littlefield are violated by enforcing decision-making rights which may conflict with residential schedule provisions and relocation rights.
Teena argues that the trial court erred by not awarding her attorney fees at trial. She also seeks attorney fees on appeal, pursuant to RCW 26.09.140. The decision to award fees is within the trial court's discretion. In re Marriage of Knight, 75 Wash. App. 721, 729, 880 P.2d 71 (1994). In awarding attorney fees, the court must balance the needs of the spouse seeking the fees against the ability of the other spouse to pay. Knight, 75 Wash.App. at 729, 880 P.2d 71. At trial, Teena filed a financial declaration showing that her monthly net income was $3,204, and her monthly expenses were $3,546. Teena requested attorney fees in the amount of $1,000. The trial court awarded her fees of $534. This award was within the trial court's discretion.
Neither party is awarded fees on appeal.
REVERSED.
WEBSTER, J., and BECKER, A.C.J., concur.
NOTES
[1] The statute nowhere refers to an "interim" plan. We assume this is a temporary parenting plan as opposed to a permanent parenting plan.
[2] Names of individual judges are used here because of the number of judicial officers involved and because of the number of orders at issue.
[3] The legislature superseded the decisions of In re Marriage of Littlefield, 133 Wash.2d 39, 940 P.2d 1362 (1997) and In re Marriage of Pape, 139 Wash.2d 694, 989 P.2d 1120 (1999). See Chapter 21, Laws of 2000.