117 P.3d 370 (2005)
In the Matter of MARRIAGE OF Sallie J. HOLMES, Appellant, and
John R.H. Holmes, Respondent.
No. 53822-5-I.
Court of Appeals of Washington, Division One.
August 8, 2005.
*371 Robert E. Prince, Glenn E. Macgilvra, Attorneys at Law, Seattle, WA, for Appellant.
Catherine W. Smith, Valerie A. Villacin, Edwards, Sieh, Smith & Goodfriend, Mabry C. Debuys, Preston, Gates & Ellis, Seattle, WA, for Respondent.
APPELWICK, J.
¶ 1 Sallie Holmes appeals from separate trial court decisions entering a parenting plan and modifying child support. A provision in the parenting plan granting the guardian ad litem (GAL) authority to determine when to reinstate the original return time in the residential schedule was a proper temporary order and not a modification of the parenting plan. In addition, because the child now resides with the father a majority of the time, the trial court did not abuse its discretion in terminating the father's support payment. Nor did the court err in refusing to order the father to pay child support to the mother based on the father's enormous wealth. Accordingly, we affirm both decisions.

FACTS

1. 2002 Parenting Plan
¶ 2 Sallie Holmes and John Holmes were married on June 24, 1989, and dissolved their marriage on May 20, 1994. A child support order and parenting plan were entered. The couple's son Jack, who was born on December 4, 1990, initially resided with Sallie a majority of the time. The parenting plan was modified several times, including appointment of a guardian ad litem.
*372 ¶ 3 In September 2000, Sallie was hospitalized following a mental breakdown. As a result, Jack went to live with his father a majority of the time. On January 23, 2002, the parties entered into an agreed parenting plan (the 2002 Parenting Plan) that incorporated the change in the residential schedule, as well as other agreed changes.
¶ 4 The plan specified that Jack's weekend residential time with Sallie during the school year would last "until return to school on Monday morning (or return to the father at 9:00 a.m. if school is not in session due to an unscheduled event)." The plan further provided that the residential schedule "shall be subject to review and periodic recommendation by the GAL" and established the following method for dispute resolution:
Disputes between the parties regarding this Parenting Plan shall be discussed with Jack's therapist and with the Guardian ad Litem[.] The Guardian ad Litem shall consult with Jack's therapist and then make a recommendation to the parents as to the solution that is in Jack's best interests. If the parents are unable to agree, the Guardian ad Litem's recommendation shall be followed until resolution by the court.

2. Temporary Amendment to the 2002 Parenting Plan
¶ 5 After entry of the 2002 Parenting Plan, a dispute arose about Sallie's alleged disruption of Jack's therapy sessions. The GAL eventually recommended that because of the potential risk to Jack, Sallie's residential time should be reduced and supervised. Sallie rejected the recommendation, and John filed a petition to modify the parenting plan. The trial court found that the 2002 Parenting Plan provided a mechanism for dealing with the dispute, based on the GAL's recommendation, that obviated the need for a modification hearing.
¶ 6 On December 10, 2002, the court entered a Temporary Amendment to the 2002 Parenting Plan that suspended Sallie's residential placement, pending further recommendation by the GAL or a court order. The GAL was directed to identify a therapeutic visitation supervisor for any further residential time and given authority to increase or decrease Jack's residential time with Sallie, subject to court review. Sallie did not seek review of the trial court's rulings.

3. 2004 Parenting Plan
¶ 7 In November 2003, John filed a Motion for Clarification of the Parenting Plan, alleging, among other things, that Sallie had been attempting to redefine the residential schedule to increase her residential time in a manner inconsistent with the parenting plan. A dispute also arose over Sallie's actions in keeping Jack at her home when he was ill on Monday mornings, rather than sending him to school or returning him to John. Following a series of warnings, the GAL temporarily suspended Jack's weekend residential time with Sallie, but then reinstated it, provided that Jack be returned to John on Sunday evening rather than on Monday morning.
¶ 8 The trial court directed the parties to discuss all remaining disagreements with the GAL, who was to make recommendations. For purposes of this appeal, the parties resolved all but one of the outstanding issues, and the trial court entered a parenting plan on January 20, 2004 (the 2004 Parenting Plan), which by its terms superseded the 2002 Temporary Amendment.
¶ 9 The 2004 Parenting Plan included the same dispute resolution mechanism as the 2002 Parenting Plan, as well as the same provision authorizing the GAL to review the residential schedule and recommend changes. In resolving the parties' dispute about Jack's weekend return time, the court crossed out the father's proposed language, reinstated the original Monday return time, and then added the language underlined below to Section 3.2:
The mother shall have residential time with the child every other Friday from after school (or 4:00 p.m. if school is not in session due to early dismissal or an unscheduled event) until return to school on Monday morning (or return to the father at 9:00 a.m. if school is not in session due to an unscheduled event). The GAL has recommended, pursuant to her authority *373 in this Section III (see p 2, line 15), that the child be returned to the father at 7:00 p.m. on Sunday, and this return time shall remain in effect until there is a further written recommendation by the GAL to change the return time.

4. Child Support
¶ 10 After Jack began to reside a majority of the time with his father in September 2000, John continued to pay child support in the amount of $8,500 per month. In December 2002, at John's request, the court ordered that he make all future payments for private school tuition and expenses directly to the providers and subtract the amount from the child support transfer payment.
¶ 11 In August 2003, John filed a petition to modify child support by terminating his transfer payment. Among other things, he alleged that Sallie was providing an excessively indulgent lifestyle and that his child support payments were being used to fund disruptive litigation.
¶ 12 The trial court concluded that there had been a substantial change of circumstances since the 1994 support order because Jack now resided with his father a majority of the time and Jack had also moved into a different age bracket. The court terminated the child support John had been paying. Among other things, the court found that John had assets of $125 million, with a net income of more than $620,000 per month; Sallie had net assets of approximately $1 million, including her home and stock investments, with a current passive monthly income of $2,051. The court also found that Sallie was voluntarily unemployed, and imputed income of $2,051 per month, for a total monthly income of about $4,000.
¶ 13 The court ruled that each parent should be responsible for Jack's expenses when he resided with them. The order provides that John is to pay Jack's entire private school costs, including tuition, books, lunch, and field trips, Jack's medical costs, agreed summer camps and extracurricular activity costs, and post-secondary school expenses. The trial court found that John's expenses for Jack are $2,460 per month, of which $1,438 is for private school tuition and $386 for health costs.
¶ 14 On appeal, Sallie contends that the authority granted to the GAL to reinstate the suspended portion of the residential schedule is an improper modification of the parenting plan. She also challenges the termination of child support payments.

DECISION

1. Parenting Plan
¶ 15 A permanent parenting plan may be changed by agreement, by petition to modify, and by temporary order. Marriage of Christel, 101 Wash.App. 13, 22, 1 P.3d 600 (2000). In order to modify a parenting plan, the court must find a "substantial change in circumstances," even if the modification is minor. Kirshenbaum v. Kirshenbaum, 84 Wash.App. 798, 807, 929 P.2d 1204 (1997); RCW 26.09.260(1), (4). A "modification" occurs "when a party's rights are either extended beyond or reduced from those originally intended." Christel, 101 Wash.App. at 22, 1 P.3d 600. A "clarification" is "merely a definition of the rights which have already been given and those rights may be completely spelled out if necessary." Christel, 101 Wash.App. at 22, 1 P.3d 600 (quoting Rivard v. Rivard, 75 Wash.2d 415, 418, 451 P.2d 677 (1969)).
¶ 16 In this case, after a series of disputes over the residential schedule, John filed a motion for "clarification." But the parties then entered into extensive negotiations that resulted in a series of agreed substantive changes, as well as clarifications. These agreed changes were then incorporated into the 2004 Parenting Plan and are not in dispute. The sole remaining dispute involves the trial court's resolution of the GAL's recommendation that Jack be returned on Sunday evening rather than Monday morning.
¶ 17 Sallie contends the trial court erred by modifying the parenting plan in the guise of "clarification." She concedes that under the terms of the 2002 Parenting Plan, the GAL was authorized to resolve parental disputes by initiating a temporary change in the residential schedule "until resolution by the court." But she maintains that the trial *374 court's addition to Section 3.2 of the 2004 Parenting Plan, which provides that the GAL's recommended change would remain in effect "until there is a further written recommendation by the GAL to change the return time," improperly authorized the GAL to permanently suspend her Sunday evening residential time and effectively modified the parenting plan without satisfying the requirements of RCW 26.09.260.
¶ 18 John proposed language for the 2004 Parenting Plan that would have made the Sunday return time a permanent part of the residential schedule. But the trial court deleted the proposed change and reinserted the original provision, which specifies a Monday morning return time. At the same time, the court adopted the recommendation of the GAL that Jack's residential time with Sallie temporarily end on Sunday evening.
¶ 19 The court may vest in an arbitrator the authority to suspend residential time so long as the parties have the right of court review. Kirshenbaum, 84 Wash.App. at 807, 929 P.2d 1204. Here, the GAL served as the arbitrator. The authority to recommend suspensions on a temporary basis necessarily encompasses both the time when they should begin and when they should end. Here, the court reviewed the recommendation of the GAL to suspend the weekend residential return time, ratified that recommendation in a temporary order, incorporated that temporary order in the revised parenting plan, and reaffirmed that under the parenting plan the GAL could recommend when to reinstate the original return time. The fact that the court's temporary order was included in the permanent parenting plan does not change the nature of the decision itself and does not constitute a modification of the residential schedule. The anticipated later recommendation by the GAL, or a future failure by the GAL to execute this duty, remained subject to the dispute resolution provision of the parenting plan, which provides for judicial review. The court did not exceed its lawful authority and did not modify the parenting plan.

2. Child Support
¶ 20 Sallie next contends that the trial court erred in terminating John's child support obligation. The crux of her argument is that the parent with the larger income is statutorily presumed to make the child support transfer payment and that John has the larger income. She also claims that the trial court abused its discretion when it failed to sufficiently consider the parties' "lifestyle" and combined high income before refusing to impose an increased child support obligation. She maintains that the trial court should order John to make a child support transfer payment that takes into account these factors.
¶ 21 We review an order modifying child support for an abuse of discretion. Marriage of Griffin, 114 Wash.2d 772, 776, 791 P.2d 519 (1990).
¶ 22 Sallie relies on Marriage of Casey, 88 Wash.App. 662, 665, 967 P.2d 982 (1997), for the proposition that John should make a child support transfer payment to her despite the fact that Jack resides a majority of time with John. The court there stated:
RCW 26.09.100(1) requires the trial court, after considering "all relevant factors," to order either or both parents to pay child support in an amount determined under RCW 26.19. The trial court calculates the total amount of child support, allocates the basic support obligation between the parents "based on each parent's share of the combined monthly net income," RCW 26.19.080(1), then orders the parent with the greater obligation to pay the other a "support transfer payment". RCW 26.19.011(9).
¶ 23 However, the portion of this quotation stating "[t]he trial court . . . then orders the parent with the greater obligation to pay the other a `support transfer payment'" is erroneous. RCW 26.19.011(9) defines "support transfer payment" as "the amount of money the court orders one parent to pay to another parent or custodian for child support after determination of the standard calculation and deviations." But this subsection does not direct which parent is to make the payment.[1]
*375 ¶ 24 Sallie further contends that even though both parents have support obligations under the statute, RCW 26.19.075(2) requires the court to order each parent "to pay the amount of support determined by using the standard calculation." She reasons that one parent or the other will have a greater obligation based on proportional income, making him or her presumptively responsible for the net support transfer payment before any consideration of reasons to deviate.
¶ 25 This argument is erroneous. RCW 26.19.075 establishes the standards for deviations from the standard calculation. But unless the court finds reasons for a deviation, RCW 26.19.020, not RCW 26.19.075, governs calculation of the presumptive support obligation. The function of RCW 26.19.075(2) is to preclude a deviation from being granted unless (1) the parties have fully disclosed their resources and (2) the court enters specific reasons for the deviation. Nothing in RCW 26.19.075 requires that each parent make a payment to the other or assumes that the parent with the greater presumptive support obligation will be responsible for a net transfer payment. Instead, RCW 26.19.075(2) merely affirms that absent a basis for deviation, each parent will pay the amount of the standard calculation to the other, if that parent is obligated to make a transfer payment.
¶ 26 Our reading of RCW 26.19.075 is supported by the child support worksheets themselves, which are required by RCW 26.19.050 and appended to chapter 26.19 RCW. The child support worksheets provide for calculation of a basic child support obligation and a presumptive transfer payment for each parent, but do not provide for the calculation of a net support transfer payment. The legislature has not taken issue with the worksheets' interpretation of the substantive provision of the statute in the nearly fifteen years the worksheets' have been used to implement the statute. Cf. Carnation Co. v. Hill, 115 Wash.2d 184, 189, 796 P.2d 416 (1990) (effect of failure of Legislature to amend statutory language in face of long-standing court interpretation). Nor would we expect the Legislature to do so.
¶ 27 Child support payments have historically been the obligation of the noncustodial parent. It has been within the province of the superior court to determine which parent would be custodial, which would pay child support and how much would be paid. The historical presumption was reflected in the Uniform Child Support Guidelines, which were approved in 1982 by the Washington State Association of Superior Court Judges. Under the ASCJ Guidelines, "the support to be paid by the noncustodial parent is that fraction of the scheduled amount in the proportion that the parent's income bears to the total income of both parents." Washington State Child Support Commission, Final Report, November 1, 1987, at 6. The obligation of the custodial parent was satisfied by providing for the child in that parent's home, as evidenced by the fact that the custodial parent received a support payment and did not make one. These guidelines were replaced by the child support guidelines as adopted by the Washington Child Support Commission and as subsequently enacted by the legislature as chapter 26.19 RCW. This chapter focuses on the method of calculation of child support, not on which parent would make payment to the other. The latter determination is made under chapter 26.09 RCW.
¶ 28 As part of the Parenting Act, Laws of 1987, ch. 460, the legislature removed the concepts of custody and visitation from the dissolution statute, RCW 26.09 RCW. In their place the legislature imposed the general requirement of a parenting plan for the child that establishes a residential schedule, allocates decision-making authority between the parents with respect to the child, and creates a dispute resolution mechanism for the implementation of the plan. RCW 26.09.184(2); See Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993). RCW 26.09.100(1) as amended, vested the superior court with authority to "order either or both parents to pay child support in an amount determined under chapter 26.19 RCW." However, the legislature did not change the historical presumption in practice that the parent with whom the child resided a majority *376 of the time would satisfy the support obligation by providing for the child while in his or her home and that the other parent would make a child support transfer payment. As this court recently noted,
[i]n those situations [where children reside a majority of the time with one parent], the obligor parent is the one with whom the children do not reside a majority of the time and that parent makes a transfer payment to the parent with whom the children primarily reside.
State ex rel. M.M.G. v. Graham, 123 Wash.App. 931, 939, 99 P.3d 1248 (2004).
¶ 29 It is undisputed that the 2004 Parenting Plan provides that Jack resides a majority of the time with John. Sallie would therefore be the presumptive child support obligor making a presumptive support payment to John
¶ 30 This presumption is not without exception, however. Casey does establish an exception to the presumption that the child support transfer payment is made to the parent with whom the child resides a majority of the time. This exception is created by deviation based upon a finding that the income of the parent with whom the child does not reside a majority of the time is insufficient to provide for the basic needs of the child. In Casey, the father and the children moved to Texas, while the mother remained in Washington. The mother's monthly income was approximately $500, and she had a learning disability that limited her earning capacity. Paying child support would have reduced her income below the poverty level, causing substantial hardship. The father, with whom the children resided a majority of the time, had income of approximately $5,848 per month. Casey, 88 Wash.App. at 665, 967 P.2d 982.
¶ 31 In addition to suspending the mother's obligation to make a child support transfer payment, the court in Casey ordered the father to pay all transportation expenses for residential transfers and to make a $1,500 per month support payment to the mother for the summer months when the children resided with her. Consequently, a deviation from the standard support calculation was properly based upon the mother's lack of income adequate to meet the needs of the children while living in the mother's household. See Marriage of Casey, 88 Wash.App. at 667, 967 P.2d 982; see also In re Yeamans, 117 Wash.App. 593, 601, 72 P.3d 775 (2003) (Casey exception permits court to deviate from proportional allocation of extraordinary expenses under RCW 26.19.080(3) only if it first deviates from basic support obligation).
¶ 32 Sallie's situation is not comparable factually. It is undisputed that Sallie's income is $2051 per month and could be increased to $4000 per month if she worked. She also has net assets of approximately $1 million. John was found to have assets of $125 million and monthly net income of over $620,000. Although the disparity in incomes is even greater here than in Marriage of Casey, the relevant issue is whether a deviation should be granted. This requires a showing of need by Jack for greater support while in his mother's home, not merely a significant difference in income of the parents.
¶ 33 The trial court made a number of findings about the lifestyles, expenditures and needs of the parties. Most significantly, the trial court found the mother has sufficient money on her own to pay for the immediate expenses of Jack while he is with her, without any financial assistance from John. These findings of fact are supported by substantial evidence. The trial court did not abuse its discretion by concluding that no basis existed to deviate and to order John to pay a child support transfer payment to her for basic support of Jack.
¶ 34 Sallie further argues for extrapolation beyond the economic table in setting support for Jack based on John's wealth and high income. However, since she has not established a need to deviate from the basic support schedule sufficient to justify that a child support transfer payment be made to her, she cannot establish the need for additional support based on extrapolation for combined net incomes above those contained in the economic table. See Marriage of Daubert, 124 Wash.App. 483, 496, 99 P.3d 401 (2004). The trial court did not abuse its discretion by denying her request.
*377 ¶ 35 Sallie next contends the trial court erred when it made the child support modification effective on the date of the filing of the petition for modification, requiring her to refund $31,000. The trial court has discretion to make the modification effective on the filing date of the petition, the date of the order, or at any time in between. Marriage of Pollard, 99 Wash.App. 48, 55, 991 P.2d 1201 (2000). Sallie asserts that the funds were "used for mother's household expenses, including funds directly for Jack's benefit." But these conclusory assertions are not supported by any citation to the record. Sallie has therefore failed to demonstrate any abuse of discretion in the effective date. See Pollard, 99 Wash.App. at 56, 991 P.2d 1201.
¶ 36 Finally, Sallie requests an award of attorney fees on appeal, based on her need and John's ability to pay. But she has failed to file an affidavit as required by RAP 18.1(c). Accordingly, the request is denied.
¶ 37 Affirmed.
WE CONCUR: AGID and COLEMAN, JJ.
NOTES
[1] Fortunately, this error in Casey does not affect the correctness of the balance of its analysis or holding.