IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>ALEXANDER WENDELL HOAG,<br><br>               Appellant,<br><br>     and<br><br>CAROL ANN SLATER f/k/a CAROL<br>ANN HOAG,<br><br>              Respondent. | No. 84754-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — Alexander Wendell Hoag and Carol Ann Slater divorced in 2014. Hoag appeals from the revision of an order entered on his motion for clarification in 2022 after he sought further direction from the court about the source of funds to be used to pay their sons' postsecondary educational expenses and related incidental costs. He asserts the court erred when it concluded that his motion for clarification was actually a motion to modify the earlier parenting plan, that the order on revision impermissibly conflicts with an out of state order relating to certain trust accounts, and seeks remand for the case to be heard by a different judge. We disagree and affirm.

FACTS

Alexander Hoag and Carol Slater divorced in May 2014. They have two children, William and Andrew, both of whom are over the age of 18.[1] Prior to the divorce, Hoag's parents, M. Silvija and Roger Hoag, created "Uniform Transfer to Minors Act" (UTMA) accounts in Michigan for William and Andrew.[2] Silvija and Roger's stated intention regarding those accounts, captured in November 6, 2016 in a notarized letter to Hoag, was for the funds to "be used for education, primarily for post-secondary education, but also available for [Alexander Hoag's] use, at [his] sole discretion as Custodian, for other needs." They also stated that the "UTMA funds were never meant to be reserved for non-educational spending by the boys after they turn age 21. The funds are to be used while they are minors or college age young adults." Later, Hoag's parents also created the Alexander W. Hoag Trust (the Hoag trust), establishing Comerica Bank[3] as the trustee and Hoag as the beneficiary. The Hoag trust provides that the trustee may, in its discretion, assist a beneficiary in support or maintenance, but also states that the "[s]ettlors' primary concerns are that Alexander's health needs and their grandchildren's education, through postgraduate school, be paid for by the Trust."

---

[1] Because several of the parties share the same last name, we refer to the appellant as Hoag and use first names for others in the interest of clarity and precision. No disrespect is intended.

[2] "The Uniform Transfers to Minors Act (UTMA) is an expansion of the Uniform Gifts to Minors Act, which has been adopted in most jurisdictions, and permits any kind of property, real or personal, tangible or intangible, to be transferred to a custodian for the benefits of a minor." 64 A.L.R.7th Art. 1, § 1 (2021). A UTMA account is an account governed by the statute of the respective state where the account was established. In Michigan, UTMA accounts are governed by Michigan Compiled Laws chapter 554.

[3] Comerica Bank has banking centers in Arizona, California, Florida, Michigan, and Texas. *About Comerica*, COMERICA, www.comerica.com/about-us.html. Correspondence between Comerica and the parties in this case originates from the Comerica locations in Michigan and California.

In 2014, pursuant to Hoag and Slater's dissolution proceedings in King County Superior Court, a judge ordered that the children's postsecondary educational expenses "will be paid entirely by the trust fund set up for this purpose by the father's parents." In 2016, the court modified the child support order (CSO) as to Hoag's monthly support payments and, in the section pertaining to postsecondary educational support, the judge handwrote that the educational expenses for each child were "expected to be" paid for by the trust and "if the trust is not available, e.g. is insolvent, the parties shall follow the established rules for establishing post-secondary support."

In 2017, the parties attended mediation to resolve the question of how the UTMA accounts were to be managed and executed a settlement agreement under CR 2A that acknowledged, among other things, that the UTMA accounts "are funds owned by the children" who are of sufficient age and maturity to be involved in the management of the accounts. It also specified that the UTMA accounts "shall generally be used for the health, education and welfare of the children which shall include, but not be limited to, education incidentals such as computer hardware and software, travel abroad, the purchase of a modest automobile, college application fees, college preparatory courses and tutoring." The CR 2A agreement further recognizes that Hoag and the sons are also beneficiaries of the separate Hoag trust and "one of the expressed intent [sic] of the trust is to provide for the children's post-secondary and post-graduate expenses, and it is expected that the trust shall provide for their tuition, room and board, books and fees and that the trust shall be used for that purpose." Both parties and their attorneys signed the

CR 2A agreement with these specified terms and the express declaration that it is "intended to be an enforceable amendment" to the existing child support order.

In the most recent CSO, issued in 2018 in response to Slater's petition to modify child support, the commissioner ordered the following:

> The children's post-secondary education is expected to be paid by the trust fund set up for this purpose by the father's parents. The trust states, "[T]he settlors' primary concerns are that Alexander's health needs and their grandchildren's education, through postgraduate school, be paid for by the Trust." . . .

> If the trust is not available, e.g. is insolvent, or will not pay, the father shall pay 100% of the boys' post-secondary educational expenses.

This order also provided that each child was entitled to have their college preparatory costs, such as visits to postsecondary schools, airfare, and hotel, prepaid by either their UTMA account or the Hoag trust. Hoag did not appeal this order.

On August 29, 2019, Hoag filed a motion for clarification of the December 2018 CSO in King County Superior Court asking whether the order prohibited payment of the children's college tuition from the UTMA accounts. On September 10, Commissioner Lack ruled that the 2018 CSO did not prohibit the use of either the Hoag trust or the UTMA account funds for the children's postsecondary educational expenses and if any party did not accept or otherwise obstructed receipt of funds from either source, that party would then be responsible for the entirety of those educational expenses. On October 14, Slater moved to revise Commissioner Lack's ruling, and Judge Chung granted the revision on November 21, finding that the December 2018 CSO "is clear and does not require clarification" in its instructions that Hoag is to pay 100 percent of the postsecondary

educational costs if the Hoag trust is not available and the UTMA funds are allocated for college preparatory expenses.

Hoag moved for reconsideration, which was denied on December 10, 2019. In an addendum to the order denying reconsideration, Judge Chung expressly ruled that Commissioner Lack's September 10 order, "to the extent that it conflicted with the December 4, 2018 order, was revised." The addendum further explained that "wherein the Father is allegedly allocating the finances for his own benefit, [Commissioner Lack's order] does, or *at least has the potential to modify the prior rulings* regarding how the two funds are to be utilized especially as they relate to when and how the Father's obligations are to be invoked." (Emphasis added.) Meanwhile, Comerica Bank had filed a petition in Wayne County, Michigan, requesting instructions for payment of educational expenses for the children from the UTMA accounts.[4] On December 4, 2019, the Michigan probate court entered an order instructing Hoag to pay for Andrew and William's education and support expenses from their respective UTMA accounts. It also stated that if Hoag did not send payment within seven days, the Hoag trust would be required to pay those expenses.

On June 16, 2022, Hoag filed a second motion for clarification, specifically requesting that he be permitted to make postsecondary educational payments into the court registry. He argued that the couple's sons had refused to accept his

---

[4] While the petition itself was not provided in the record, the order of the Michigan probate court was filed in the King County case and transmitted to this court as part of the record on appeal.

payments.[5]  Slater moved to continue the hearing on the motion in order to retain counsel and the trial court continued the hearing to July 26.  On July 19, Slater filed a response, along with a motion to restrict abusive litigation pursuant to chapter 26.51 RCW and a request for sanctions under CR 11.  She argued that the trial court had already adjudicated the issue of the source of payment for the children's postsecondary education expenses and that Hoag was costing her resources in unnecessarily re-litigating the issue.  She also referenced a history of domestic violence and parenting plan restrictions between her and Hoag.  Hoag filed a strict reply to the motion for clarification on July 21.  On July 26, the trial court ordered another continuance of the hearing on the motion for clarification until the issue of abusive litigation could be resolved.

On August 15, Hoag filed a response to the motion regarding abusive litigation, arguing that the educational expenses must be paid from the UTMA accounts per the Michigan probate court order and Slater and the children have continuously refused to accept payments.  On August 25, Judge O'Donnell ruled that Hoag had not engaged in abusive litigation because the motion for clarification was warranted by existing law, the factual contentions were supported by evidence, and the issues being litigated had previously been resolved in Hoag's favor in the past five years.  This latter portion of Judge O'Donnell's ruling was presumably a reference to Commissioner Lack's September 2019 order, despite the fact that order was later reversed in its entirety by Judge Chung on revision.

---

[5] Both Andrew and William deny that they have rejected any payments from Hoag's personal accounts, but Andrew acknowledges that he has denied payments from the UTMA accounts.

In order to give the parties time to review the ruling, the court continued the hearing on the motion for clarification to the following month.

On September 8, 2022, Commissioner pro tem Ortiz granted Hoag's motion for clarification, explicitly ruling that postsecondary educational payments "can be made directly to the post-secondary institution, to the minor child, the mother, *or to the court registry.*" (Emphasis added.) Commissioner Ortiz also denied Hoag's request for over $21,000 in attorney fees, but awarded a reduced amount of $10,000 based on Slater's "refusal to follow court orders and intransigence," but without conducting a lodestar calculation.

Slater filed a motion for revision of Commissioner Ortiz' order and a hearing was conducted on October 14. In response to Judge Ryan's assertion during the hearing that Commissioner Lack's order was revised and therefore has no controlling authority, Hoag argued that the question of where to make education payments was an ongoing issue. He contended that this was so because, in the August 19 hearing on abusive litigation, Judge O'Donnell concluded that Judge Chung's October 2019 revision order was unclear regarding this issue. On October 17, 2022, Judge Ryan granted Slater's motion for revision, expressly reversing Commissioner Ortiz' 2022 order in its entirety and further specifying that the "Order on 9/11/2019 by Commissioner Lack was revised by Judge Chung and has no legal precedential value." Judge Ryan reasoned that Hoag's motion was actually a modification rather than a clarification as "there was nothing to clarify" and "because [Hoag is] adding a condition that allows someone to act in a certain way." Hoag filed a motion for reconsideration which was denied.

Hoag timely filed a notice of appeal designating for review both Judge Ryan's revision of Commissioner Ortiz' order and denial of reconsideration.

ANALYSIS

While this appeal was pending, Slater filed a motion to dismiss the appeal as moot because "neither child is attending college or other post-secondary programs," and both sons have aged out of the CSO. There are no new expenses to pay, so she averred there are no issues to resolve. Additionally, Slater claimed that the funds in the UTMA accounts at issue here have been exhausted. Slater thus concluded that "[a]ny decision of this Court would have no effect on the parties."

In response, Hoag argued that there were still several payment issues between the parties that needed to be addressed by this court. First, he asserted that the parties needed guidance as to how the funds paid into the court registry should be handled. Second, Hoag expressed concern that Slater might seek reimbursement for expenses in the future, raising the issue of permissible sources once again. Third, Hoag noted the potential consequences the sons might face if it was determined that they were wrongfully refusing payments from the registry. Fourth, Hoag averred that the import of the Michigan court order was still unclear and needed to be clarified. Finally, Hoag cites a potential conflict between the order on appeal and a separate finding of contempt in an earlier order that is outside the scope of this appeal.

This court directed the parties to confirm Hoag's assertion that he had paid $30,000 into the court registry and answer whether those funds should be released

to him. While they concurred that Hoag had placed that amount into the court registry, and Slater agreed he was entitled to the return of those funds, Hoag explained that the money could only be released to William. Because Hoag could still obtain relief as to a determination regarding those funds, we ultimately concluded that the appeal was not moot.

However, at oral argument before this court, this panel learned for the first time that the $30,000 held in the court registry had been released to William in the weeks before the hearing on Hoag's appeal.[6] While counsel for Slater expressed surprised at this development and Hoag's attorney disclaimed knowledge of the action to release the funds prior to the disbursement, apparently neither party believed it was significant enough to appraise the panel of judges hearing the matter of this significant procedural development.[7] Nonetheless, we reach Hoag's various assignments of error.

I.      Modification of Child Support Order

Hoag first argues that Judge Ryan erroneously analyzed Commissioner Ortiz' 2022 order as one on modification, rather than clarification, of the 2018 CSO. At oral argument before this court, Hoag remained committed to this position and characterized his request for clarification as seeking guidance on how to implement a procedural detail, specifically, how payments for William's postsecondary expenses were to be made.[8]

---

[6] Wash. Ct. of Appeals oral arg., *In re Marriage of Hoag,* No. 84754-6-I (Oct. 29, 2024), at 9 min., 19 sec., *video recording by* TVW, Washington State's Public Affairs Network https://www.tvw.org/watch/?clientID=9375922947&eventID=2024101191.
[7] *Id.*; *id.* at 18 min., 37 sec.
[8] *Id.* at 1 min., 4 sec.

Clarification of an order issued in a dissolution is "'merely a definition of the rights which have already been given and those rights may be completely spelled out if necessary.' . . . A modification, on the other hand, occurs when a party's rights are either extended beyond or reduced from those originally intended" in the order. *In re Marriage of Christel*, 101 Wn. App. 13, 22, 1 P.3d 600 (2000) (citation omitted) (quoting *Rivard v. Rivard*, 75 Wn.2d 415, 418, 451 P.2d 677 (1969)). In contrast, CR 60(a) permits the court to correct "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission" by its own initiative or in response to the motion of any party.

"Generally, a child support order can only be altered following a petition for modification and upon a showing of a substantial change of circumstances." *In re Marriage of Morris*, 176 Wn. App. 893, 901, 309 P.3d 767 (2013); RCW 26.09.170(1). The party requesting modification of a CSO must adhere to the specific procedural rules of RCW 26.09.170, including filing a petition with financial worksheets and serving the other party. RCW 26.09.175(1), (2). A petition for modification is "'significant in nature and anticipates making substantial changes and/or additions to the original order of support.'" *Morris*, 176 Wn. App. at 901 (quoting *In re Marriage of Scanlon*, 109 Wn. App. 167, 173, 34 P.3d 877 (2001)).

When the trial court is presented with a motion for revision of a commissioner's order, it considers the issue de novo and this court's review is of the trial court's ruling, not that of the commissioner. *In re Marriage of Fairchild*, 148 Wn. App. 828, 831, 207 P.3d 449 (2009). "Interpretation of a child support

order is a question of law that we review de novo." *In re Marriage of Sagner*, 159 Wn. App. 741, 749, 247 P.3d 444 (2011).

In previous cases, the determination of whether a motion will be treated as a request for clarification or a petition for modification has depended on whether the ruling substantially changes the original order. For example, in *Rivard*, the parties could not agree on the meaning of the requirement in the divorce decree that entitled the father to "reasonable visitation rights." 75 Wn.2d at 417. Our State Supreme Court concluded that the trial court's ruling that the father could have the children on alternate weekends and one evening during the week was a clarification, rather than a modification, because the father "had the right to have the court specifically spell out what rights of visitation with his children were available to him." *Id.* at 419.

In *Christel*, the court looked at the explicit phrasing of the order, including the use of "'in the future'" and "'waiver of a parent's right,'" and held that the analysis performed by the trial court established that what had been ordered was a modification. 101 Wn. App. at 23 (emphasis omitted). Because the language at issue in *Christel* suggested prospective application, the trial court's order went "beyond explaining the provisions of the existing parenting plan" and had "on its face impose[d] new limits on the rights of the parents." *Id*. For many years this court has reliably applied the same reasoning in a number of cases, both published and not.[9] *See, e.g., In re Marriage of Holmes,* 128 Wn. App. 727, 734-35, 117

---

[9] Pursuant to GR 14.1(c), we may cite to unpublished opinions as "necessary for a reasoned decision." These cases are included here solely to illustrate the fact that this interpretation is not novel, but rather has been applied consistently by this court.

P.3d 370 (2005); *In re Marriage of Audritsh*, No. 81127-4-I, slip op. at 9 (Wash. Ct. App. Feb. 1, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/ 811274.pdf; *In re Marriage of Sinsheimer,* No. 78697-1-I, slip op. at 3 (Wash. Ct. App. July 29, 2019), https://www.courts.wa.gov/opinions/pdf/786971.pdf; *In re Marriage of Venn*, No. 77891-9-I, slip op. at 6-7 (Wash. Ct. App. Jan. 14, 2019), https://www.courts.wa.gov/opinions/pdf/778919.pdf; *In re Marriage of Faris*, No. 75978-7-I, slip op. at 4-5 (Wash. Ct. App. Feb. 20, 2018), https://www.courts .wa.gov/opinions/pdf/759787.pdf; *In re Marriage of Forrest*, No. 71018-4-I, slip op. at 10 (Wash. Ct. App. Nov. 17, 2014), https://www.courts.wa.gov/opinions /pdf/710184.pdf; *In re Marriage of Massingham*, No. 45235-9-II, slip op. at 10-11 (Wash. Ct. App. Oct. 23, 2014), https://www.courts.wa.gov/opinions/pdf/ D2%2045235-9-II%20%20Unpublished%20Opinion.pdf

Hoag asserts that his motion for clarification did not request a *change* in his obligation to pay postsecondary educational expenses, but instead asked the court to specify *where* those funds should be deposited.[10]  He argues that supplying missing language is a proper clarification.[11]  Although he now frames the motion as an open inquiry as to where the money should go, in the motion before the trial court, he expressly requested permission to make the payments into the court registry.  While his 2022 motion is indeed captioned as one for clarification, the argument section begins by stating, "The Court should allow the Petitioner [Hoag]

---

[10] Hoag states that while the 2018 CSO requires that child support be paid into the Washington State Support Registry maintained by the Division of Child Support before the children turned 18, it did not specify where to deposit funds after they turned 18.

[11] In support of this assertion, Hoag relies on *Presidential Estates Apartment Associates v. Barrett*, 129 Wn.2d 320, 917 P.2d 100 (1996), a land encroachment case that centered on correction of clerical error.

to make future payments from William's UTMA account for post-secondary expenses directly into the court registry." The substantive argument in support of this requested relief is simply recitation of the parties' conflict around payment in satisfaction of this obligation. Nowhere in this motion does Hoag suggest *confusion* about where he was to direct payments under the 2018 CSO or disagreement between the parties about such instruction, but rather focuses on his assertions that Slater, and the couple's sons, have obstructed his efforts to make payment. In fact, Hoag's argument on this issue concludes by stating that his motion is

> [s]olely focused on addressing the logistical issue of insuring receipt of the UTMA payments without further harassment and obstruction by [Slater], as well as his request for fees. Since [Slater] has made it virtually impossible to make payments to William from the UTMA account, [Hoag] is requesting the Court address that issue by allowing him to make these payments directly into the court registry.

Slater counters that, because the court registry accepts all payments without questioning the source of funds, allowing such a process here has the potential to modify the provision in the 2018 CSO that requires payment of postsecondary education specifically from the Hoag trust or Hoag's personal funds. In the 2019 order on revision, Judge Chung similarly reasoned that allowing payment into the court registry "has the potential to modify the prior rulings regarding how the two funds are to be utilized especially as they relate to when and how *the Father's obligations* are to be invoked." (Emphasis added.) On that basis, the court revised Commissioner Lack's 2019 order, which necessarily included the prior ruling that had permitted Hoag to make payments into the court registry in the first place.

Superficially, Hoag's 2022 motion for clarification does not change his obligation to pay for his sons' postsecondary education; a responsibility that Hoag cannot deny is his. However, both his 2022 motion to clarify and his argument on appeal reflect his intention to satisfy these payments with funds from a different account than the one the 2018 CSO directed him to use. In the 2022 motion for clarification, not only did Hoag request to pay directly into the court registry which would, as Slater and the trial court reasoned, conceal the origins of the payment, but he also directly asserted that the court "should allow [him] to make future payments *from William's UTMA account for post-secondary expenses* directly into the court registry." (Emphasis added.) Hoag echoes this assertion on appeal, stating that the Michigan probate court order requires him to pay for the postsecondary education from the UTMA accounts. Irrespective of the separate issue of whether a Michigan probate court order may change a Washington CSO, discussed in Part II, *infra*, Hoag's request would result in a modification to the plain language of the 2018 CSO that dictates that "[t]he children's post-secondary education is expected to be paid by the trust fund. . . . If the trust is not available . . . *the father shall pay* 100% of the boys' post-secondary educational expenses." (Emphasis added.) Further, use of the UTMA funds, which ultimately belong to Andrew and William rather than the Hoag trust or Hoag's other personal funds, enriches Hoag at the expense of his sons.

At oral argument before this court, Hoag took issue with this court's reading of the plain language of the 2018 CSO to mean that he would be personally

responsible for those expenses if the Hoag trust had been exhausted.[12] However, this interpretation of the language used in the 2018 CSO regarding Hoag's financial obligation is consistent with the trial court's use of the term "father" since the inception of the dissolution proceedings over a decade ago. For example, the original child support order entered on May 22, 2014 expressly identifies "Alexander Hoag" as the "Person Paying Support (Obligor)" in section 3.2. Then, in section 3.7, "Reasons for Deviation From Standard Calculation" of child support, the court repeatedly uses "father" to refer to the obligor, Alexander Hoag:

> Parents' possession of extraordinary wealth, including $2,720,017.00 in trust set up by *father's* parents, to which the *father* and both children are beneficiaries. The parents leave this marriage with substantial wealth, (i.e. *father* approximately $4.3 million and mother approximately $1.75 million). The *father* has a history of very significant gifting from his family members and the parties and their children enjoy a comfortable life-style and standard of living allowed by the parents' wealth and income. The support payments are based on the trust income, (2013 trust income, divided by 12 and then allocating half of that amount to be available in each household for the benefit of the boys) and will serve to provide and maintain a level of parity between the two homes for the benefit of the boys. It is important for them, and is in their best interest, to not experience a significant economic disparity as between the two homes, which would otherwise exist but for the upward deviation.

(Emphasis added.) In its ordering language in section 3.15, "Payment for Expenses not Included in the Transfer Payment," the court again consistently uses "father" to refer to Hoag in establishing his financial obligations with respect to his sons: "The petitioner/father shall pay 52%." To be clear, the petitioner in the dissolution action was "Alexander Hoag," as set out in the caption of the original 2014 child support order.

---

[12] Wash. Ct. of Appeals oral arg., *supra,* at 4 min., 45 sec.

In section 3.17, "Income Tax Exemptions," the trial court again used "the father" to refer to Alexander Hoag personally: "Each parent shall be entitled to take one child as an exemption each year, with the *father* taking Andrew and the mother taking William." (Emphasis added.) Later in that section, the court noted "the *father* is the custodian of the boys['] UBS[13] accounts. *He* shall provide quarterly statements of those accounts to the mother within 7 days of receiving such statements. . . . The *father* shall be entitled to reimburse himself for any amounts he pays for the boys' taxes and the *father* shall reimburse the mother for any amounts she pays for the boys' taxes, within 30 days." (Emphasis added.) The only way that this section of the 2018 CSO can be read logically is if "father" refers to Alexander Hoag *personally*, particularly as to the discussion of not only his obligations, but his right to claim one of the children in his annual tax returns. Similarly, section 3.18, "Medical Support—Health Insurance," directs the parties in the provision of health insurance coverage for the children "in the event the *father* does not have health insurance available to him through his employment." Again, these orders only make sense when "father" is read to mean Alexander Hoag personally. Likewise, the attached child support worksheets identify Slater as "mother" and Hoag as "father." It contains precise findings about the parties' income, assets, and obligations, and specifically includes, among other items, "Father's Household" assets set out with descriptions and values. Again, the only

---

[13] UBS is the financial management company who provided investment services for the Hoag Trust, under an agreement with the trustee Comerica Bank, and for the UTMA accounts for which Hoag was the custodian.

reasonable reading of this document is that "father" refers to Alexander Hoag personally.

The original CSO was modified in 2016 and the court again used "father" to refer personally to Alexander Hoag. For example, section 17, "Post-secondary educational support (for college or vocational school)," in printed language notes, "The children's post-secondary educations will be paid by the trust fund set up for this purpose by the *father's* parents."[14] In section 21, a paragraph discussing other shared expenses states,

> If the mother requests the *father* contribute to the children's expenses, she shall inform the *father* of the decision she has made and inform him of what it will cost, to her knowledge and belief. To the extent there is information available regarding the cost, the mother will also provide this information to the *father*. If the *father* does not object in writing within 10 days of him receiving the notice of the expense, the expense will be paid pursuant to the order above. If the *father* does object within ten days the matter will be arbitrated.

(Emphasis added.) This further demonstrates that "father" refers to Alexander Hoag personally as this passage establishes not only obligations, but rights and certain remedies available to him. Notably, the 2016 CSO appears to have been drafted by Hoag's own counsel.

The CR 2A agreement entered after mediation also uses "father" to indicate Alexander Hoag in his personal capacity. It notes,

> The petitioner *father* agrees that he will have discussions with his children regarding the investment strategy and use of these accounts and work cooperatively with the children to develop a plan in the children's best interests; provided that the petitioner *father* retains his final approval of the investment strategy and expenditures from accounts.

---

[14] This section also includes handwritten modifications which are not relevant to this issue.

(Emphasis added.) As with the other uses of this term throughout litigation, the context clearly establishes that the mediator used this term to identify Alexander Hoag's personal obligations under the agreement as to communication with his children and authority to grant final approval with regard to the funds in the UTMA accounts. There can be no other interpretation than the word "father," as used in the binding CR 2A agreement, signed by Hoag, Slater and their respective attorneys, refers to Alexander Hoag, personally.

Further, section 6 of the final order and findings on the 2018 petition to modify the CSO, which resulted in the 2018 CSO at issue in this appeal, expressly states,

> The court should change post-secondary support as follows: There is a trust set up by Mr. Hoag's parents for the boys' post-secondary and graduate school educations, the Alexander Hoag Trust. It is anticipated that the trust will pay 100% of each boys' [sic] post-secondary educational expenses. However, the court is modifying the order to state that, if the trust does not pay, then *the father*, who is also a beneficiary of that trust, will pay 100% of the boys' post-secondary educational expenses.

(Emphasis added.) Again, the only logical way to read this paragraph is that the "father, who is also a beneficiary of that trust," means Alexander Hoag, personally. Finally, Judge Chung's addendum to his 2019 order revising Commissioner Lack's ruling also expressly and repeatedly uses "father" to refer to Alexander Hoag personally. It states,

> The current motion before this Court is Petitioner *Alexander Hoag's ("Father")* Motion for Reconsideration. . . . The September 10, 2019 Order followed *Father's* Motion for Clarification. . . . The *Father* had also sought revision of the December 4, 2018 Order. . . .
>
> *Father's* primary argument on this Motion for Reconsideration is that this Court did not have jurisdiction over the UTMA account when this

- 18 -

Court ruled that these accounts must be used for specific purposes, i.e. college preparatory costs.

The *Father* is incorrect as follows. As indicated in this Court's November 21, 2018 written order, incorporating the oral rulings, this Court found that the December 4, 2018 order on modification was specific in how and when the trust funds and UTMA funds were to be used. This Court, therefore, held that Commissioner Lack's September 10, 2019 order, to the extent that it conflicted with the December 4, 2018 order, was revised. Specifically, Commissioner Lack held that "if a party obstructed the use of Trust or UTMA account funds to be used for college expenses, then the obstructing party would be responsible for the entirety of those expenses." See paragraph 11. Although such holding may be "reasonable" in a normal light, under the peculiar circumstances of this case, wherein the *Father* is allegedly allocating the finances for his own benefit, it does, or at least has the potential to modify the prior rulings regarding how the two funds are to be utilized especially as they relate to when and how the *Father's* obligations are to be invoked. As such, the Order granting Clarification was improper and this Court granted the Mother's Motion for Revision.

*Father's* Motion for Reconsideration is hereby denied.

(Emphasis added.) This court's interpretation of the use of "father" in the 2018 CSO to refer to Alexander W. Hoag, personally, is consistent with the trial court's use of that language throughout the years of extensive litigation between these parties.

More critically, Hoag's 2022 request that future payments be made from the UTMA accounts *into the court registry* would be a direct modification of Judge Chung's 2019 order on revision that expressly reversed Commissioner Lack's order that had allowed precisely this payment arrangement which Hoag again seeks. Judge Chung's 2019 revision order reflected the particular litigation history between the parties and the ongoing dispute about the proper source of the postsecondary support payments and, in revising Commissioner Lack's order,

effectively ruled that payments into the court registry from the UTMA account would not be permitted.  In order to effectuate such a change to the plain terms of the 2018 CSO, Hoag must petition for a modification, submit accompanying financial worksheets, and allow Slater the opportunity to request a hearing pursuant to RCW 26.09.175(1) and (2).  Therefore, Judge Ryan properly analyzed Hoag's 2022 motion for clarification and the resulting order as an improper attempt at modification without following the procedures established by statute.[15]

II.      Washington Law Controls

Hoag next contends that Judge Ryan's 2022 order on revision is void because it is incompatible with the 2019 order from the Michigan probate court, which explicitly directs him to pay for Andrew and Williams's "education and support expenses" from each child's respective UTMA account.[16]  He argues that the Michigan probate court order is "binding on all Washington courts," because the use of a UTMA account is governed by the law of the state where the UTMA is located.  The practical effect of which is that the order of the Michigan probate court would control over the 2018 Washington CSO.  Hoag adhered to this position at oral argument before this court.[17]  His contention on this issue is misleading.

The Michigan UTMA, uses language that is similar to Washington's counterpart, ch. 11.114 RCW, and provides that it applies to transfers "if, at the

---

[15] Hoag takes issue with Judge Ryan's explanation during the hearing that a modification is something which "allows someone to act in a certain way," but again, we review the question of law as to whether the motion was for clarification or a modification de novo.  *Sagner*, 159 Wn. App. at 749.

[16] The "any education and support expenses" can reasonably be interpreted as including tuition, since this order also ruled that $29,045 was a reasonable educational expense for the 2019-2020 school year at the University of Washington.

[17] Wash. Ct. of Appeals oral arg., *supra,* at 5 min., 17 sec.

time of the transfer, the minor, or the custodian is a resident of this state or the custodial property is located in this state." MICHIGAN COMPILED LAWS (MCL) § 554.526(1). It also provides that a "transfer that purports to be made and that is valid under the uniform transfers to minors act . . . or a substantially similar act of another state is governed by the law of the designated state." MCL § 554.526(3). Because the UTMA account is undisputedly located in Michigan, it is clear that Michigan law applies to the accounts at issue here and Slater seems to acknowledge as much.

The 2018 Washington CSO directs that the children's "post-secondary education is expected to be paid by the trust fund" with Hoag to pay 100 percent of the educational expenses if the trust is unavailable. The language in the 2019 Michigan probate court order directing Hoag to "pay [the children's] education and support expenses . . . from [each child's] Uniform Transfers to Minor Act Account" would act to modify the clear directive of the 2018 Washington CSO because it changes the source of the payments. It may not do so.

The Uniform Interstate Family Support Act (UIFSA), adopted by Washington in 2002,[18] was created to simplify often-complicated litigation arising from different CSOs in different states. *In re Marriage of Schneider*, 173 Wn.2d 353, 358-59, 268 P.3d 215 (2011). It provides that "one state [will] have continuing exclusive jurisdiction" over a child support order. *Id*. at 359. RCW 26.21A.120(1)(a) dictates that

> [a] tribunal of this state that has issued a child support order consistent with the law of this state has and shall exercise continuing,

---

[18] Ch. 26.21A RCW.

- 21 -

> exclusive jurisdiction to modify its child support order if the order is the controlling order and:
> . . . [a]t the time of the filing of a request for modification this state is the residence of the obligor, the individual obligee, or the child for whose benefit the support order is issued.

Washington does not have jurisdiction to modify the CSO if all individual parties agree that a tribunal of another state has jurisdiction over at least one of the parties or the order at issue is not the controlling order. RCW 26.21A.120(2). As both parents in this case, and the two adult children, all resided in Washington at the time the orders here were issued, and as neither party disputes that the 2018 CSO is the controlling order on child support, Washington has continuing and exclusive jurisdiction according to state law.

Michigan has also enacted the UIFSA and its law includes a specific provision with instructions on how to determine which order controls, MCL § 552.2207. MCL § 552.2207(1) provides that if "only 1 tribunal has issued a child-support order, *the order of that tribunal controls and must be so recognized*." (Emphasis added.) There is no evidence in the record that any court other than Washington established a CSO for these parties, so even under Michigan law, the 2018 Washington CSO necessarily controls. The Michigan probate order may not decide matters already resolved in the 2018 Washington CSO. Further, the Michigan probate order does not acknowledge the Washington 2018 CSO in any way, much less offer analysis of its authority to change any terms of that order. Without the consent of the parties, Michigan did not have jurisdiction under either state's respective UIFSA statutes to require a source of payment for educational expenses that differed from that directed by the 2018 Washington CSO.

Accordingly, the Washington court retains continuing jurisdiction over matters of child support and the 2022 order on revision is proper on that basis.

III.     Purported Dicta and Evidence of Judicial Bias

Hoag contends that Judge Ryan's order on revision contains dicta and requests that this court declare it legally nonbinding in order to prevent confusion in future litigation.  He further avers that the order demonstrates that Judge Ryan was not impartial in his decision.  These assertions are baseless.

The language Hoag asserts is dicta is the "Order entered on 9/11/19 by Commissioner Lack was revised by Judge Chung and has no legal precedential value."  He argues that the only issue before Judge Ryan was whether to revise Commissioner Ortiz' 2022 order on clarification and any reference to Commissioner Lack's previous order from 2019 was unnecessary.  As a preliminary matter, the term "dicta" is only applicable to the opinions of appellate courts.  "Trial courts do not make dicta. 'A statement is dicta when it is not necessary to the court's decision in a case' and as such is not binding authority.  The concept has no application to a party to whom a trial court's language was directed." *Gabelein v. Diking Dist. No. 1 of Island County,* 182 Wn. App. 217, 239, 328 P.3d 1008 (2014) (citation omitted) (quoting *Protect Peninsula's Future v. City of Port Angeles*, 175 Wn. App. 201, 215, 304 P.3d 914 (2013)).  At best, the challenged language would be surplusage.

More critically, and fatal to Hoag's claim on this issue, Hoag expressly cited the previous decisions of two judges and Commissioners Lack and Ortiz during the 2022 hearing before Judge Ryan in order to explain the history of the litigation

between the parties on the same issue that was again before the court. Further, he had cited Commissioner Lack's 2019 order in his 2022 motion for clarification and expressly argued that

> [p]ursuant to the Respondent's Motion for Revision of Commissioner Lacks' Order on Clarification, Judge Chung entered an order that left Commissioner Lack's Order on Clarification intact insofar as long as [sic] it does not conflict with the 2018 Child Support Order. . . . Commissioner Lack's Order on Clarification addressed issues that were not raised in the 2018 Child Support Order, so there is no conflict between the two orders.

(Citation omitted.) Judge Ryan responded that he had read "constant discussions of Commissioner Lack's order" in the briefing and clarified that "Commissioner Lack's order was revised. . . . It has no, has no value. It was revised. Everything in there, it's over."

Judge Ryan acknowledged that the threshold question before him was whether Hoag's motion was properly determined to be a clarification or whether it was actually a modification. He then explained that such analysis must also consider that a direct payment to the court registry "essentially obfuscates that payment." In his ruling, Judge Ryan stated that "in some ways, Mr. Hoag is trying to essentially capture the spirit and essence of Commissioner Lack's order. . . . But I read Judge Chung as revising Commissioner Lack's order, and Commissioner Lack's order has no legal weight because it was revised and therefore, reversed." The dialogue between Hoag and Judge Ryan about the past decisions in the case, paired with the statements Judge Ryan made in his ruling, demonstrate that Hoag's reliance on Commissioner Lack's order was relevant to the judge's ultimate decision. Hoag's repeated citation to an older, non-binding order that had been

reversed on revision, as a means of attempting to relitigate a matter already decided, is a relevant detail in the procedural history of this case as demonstrated by Judge Ryan's deliberate inclusion of this fact as an express finding in the written order, likely with the intention of preventing further attempts to revisit the issue.

Finally, the statement in the 2022 order on revision is simply a correct account of the procedural history in this case. Commissioner Lack's order on September 10, 2019 was subsequently revised by the trial court's order on November 13, 2019. Without a successful appeal of Judge Chung's revision, that ruling invalidated Commissioner Lack's order. *See* RAP 5.2(a) ("[A] notice of appeal must be filed in the trial court within . . . 30 days after the entry of the decision of the trial court that the party filing the notice wants reviewed."). Hoag's repeated reliance on the invalidated 2019 commissioner's order as controlling authority was improper and Judge Ryan sought to make that clear to the parties.

Hoag next takes issue with two particular statements made by Judge Ryan during the hearing and asserts that, if remanded, the case should be assigned to a different judicial officer based on his claim that Judge Ryan was not impartial in reaching his earlier rulings. Every litigant is entitled to be heard by an impartial judge. *In re Marriage of Rounds*, 4 Wn. App. 2d 801, 808, 423 P.3d 895 (2018). "Evidence of a judge's actual or potential bias is required" in order to establish entitlement to relief on such a claim. *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009). "Judicial rulings alone 'almost never constitute a valid showing of bias'" and the party claiming judicial bias must allege specific facts to establish that a judge had a personal bias against that party. *West v. Wash.*

- 25 -

*State Dist. and Mun. Court Judges Ass'n,* 190 Wn. App. 931, 943, 361 P.3d 210 (2015) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004)). However, Hoag stops short of arguing that reversal is required due to judicial bias and limits his claim to reassignment upon remand. Because we affirm Judge Ryan's order on revision, remand is unnecessary and we need not consider this challenge further.

IV.     Attorney Fees

Both Hoag and Slater request attorney fees pursuant to RAP 18.1 and RCW 26.09.140. However, neither party dedicates a portion of their briefing to the request as anticipated by the rules or provides the supporting argument "'required under [RAP 18.1] to advise the court of the appropriate grounds for an award of attorney fees as costs.'" *Boyle v. Leech*, 7 Wn. App. 2d 535, 542, 436 P.3d 393 (2019) (quoting *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012)). A bare request for attorney fees on appeal is insufficient to justify an award. *Id*.

Hoag also seeks reinstatement of the $10,000 attorney fee award he was granted by Commissioner Ortiz at the conclusion of the original 2022 motion hearing based on the commissioner's finding of Slater's intransigence. Slater correctly points out that the scope of the appeal is constrained to review of the order on revision, not the propriety of the underlying order of the commissioner. Hoag is not entitled to reinstatement because he is not the prevailing party. RAP 18.1. Further, Hoag has failed to engage in any analysis as to how the trial judge abused his discretion by reversing the award for intransigence on revision. *See In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 488, 421 P.3d 1046 ("We review

- 26 -

attorney fee awards based on intransigence for an abuse of discretion. 'Discretion is abused when the court's decision is outside the range of acceptable choices or based on untenable grounds or untenable reasons.'" (citation omitted) (quoting *In re Marriage of Wixom*, 190 Wn. App. 719, 725, 360 P.3d 960 (2015))).  During the hearing on the 2022 motion for revision, Judge Ryan explained that the commissioner did not conduct the appropriate analysis under the lodestar method, including whether the hourly rates for Hoag's counsel and the hours expended were reasonable, before arriving at the $10,000 figure.  Hoag does not explain how this reasoning amounts to an abuse of discretion and therefore, he is not entitled to a reinstatement of the previous fee award.

Affirmed.

Hazelrigg, ACJ

WE CONCUR:

Díaz, J.

Dwyer, J.